UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| **HUMANA INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No. _____ |
| **v.** | ) | |
| | ) | |
| **TEVA PHARMACEUTICALS USA, INC.,** | ) | |
| **TEVA NEUROSCIENCE, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **ADVANCED CARE SCRIPTS INC., and** | ) | |
| **ASSISTRX INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>COMPLAINT</u>

### I.       INTRODUCTION

1.      This action arises out of a scheme to bilk Medicare and its contract insurers and to enrich a small cabal made up of Teva (one of the world's largest drug companies), two sham charities, and two startups (now worth millions).  The scheme was designed to inflate both the sales and price of Teva's expensive multiple sclerosis drug Copaxone by providing copayment assistance to patients who otherwise would have chosen cheaper alternatives.

2.      The law prohibits Teva from providing copayment assistance directly because it is a kickback.  So in a carefully calibrated way, the conspirators disguised Teva's donations as unrestricted charitable assistance available for any multiple sclerosis drug.  But the assistance was in fact targeted only for Copaxone.  The copay for Copaxone can be thousands of dollars for any single patient but it is a minor fraction of the total expense, and the perpetrators relied on Medicare and other insurance to cover the rest.  For years this scheme allowed Teva to reap billions at the expense of insurers, and along the way Teva paid a cut to the charities, startups,

and their insiders that joined in its deceit in the form of tens of millions of dollars in "administrative" and other fees.  It was, in short, a fraud.

3.      Plaintiff Humana Inc. ("Humana") is one of the insurers harmed by this scheme, and brings this action against defendants Teva Pharmaceuticals USA, Inc. ("Teva USA"), Teva Neuroscience, Inc. ("Teva Neuroscience") (collectively, "Teva"), Advanced Care Scripts Inc. ("ACS"), and AssistRx Inc., to recover overpayments for Copaxone, a drug manufactured by Teva for the treatment of multiple sclerosis.

4.      Teva caused the submission of false claims to Humana, in particular with respect to Medicare Advantage patients, as a result of kickbacks that Teva paid in the form of illegal copay subsidies for Copaxone.  Teva knowingly and willfully engineered these kickbacks through an enterprise with defendants ACS and AssistRx Inc., which are specialty pharmacies, and copayment foundations Chronic Disease Fund Inc. ("CDF") and The Assistance Fund Inc. ("TAF").

5.      The scheme was straightforward.  Copaxone patients who faced copay obligations were routed to ACS at Teva's direction.  ACS in turn arranged for the patients to obtain copay coverage from both CDF and TAF.  (AssistRx later performed this function as well.)  ACS then reported back to Teva the number of Copaxone patients receiving copay coverage from each foundation.  Both during its annual budgeting process and intermittently throughout the year, Teva used information from ACS and the foundations to calculate and then pay the money each foundation would need to cover existing Copaxone patients' copays.  Following this pattern, Teva paid the foundations more than $328 million over the course of a decade.

6.      Though the payments were ostensibly for multiple sclerosis funds that could be used for any manufacturer's drug, the scheme was designed and carried out in such a way as to

benefit only Teva and its confederates—in other words, to create the false appearance of a general charitable donation that was in fact a kickback.  Teva paid the foundations with the intent and understanding that they would use Teva's money specifically to cover the copays of patients taking Copaxone.  In so doing, Teva intended that Copaxone patients—but not insurers—avoid the increasingly steep prices charged for the drug.

7.      This induced patients, including Medicare patients, to purchase Copaxone and to substantially increase Teva's sales, ACS and AssistRx's fees, and ultimately Humana's costs. From late 2006 to 2018, while Teva was subsidizing Copaxone's cost through CDF and TAF, Teva raised the price of 20 mg Copaxone by 500%, from approximately $18,000 per year to more than $90,000 per year.  In contrast, if Copaxone's price had risen only at the rate of inflation over the same period, its price in 2018 would have been 75% lower.  This resulted in Humana spending more than $1 billion on Copaxone during the period.

8.      Teva was not the only passenger on the gravy train.  By conspiring with Teva, the foundations reaped millions in "administrative fees" and rewarded their lead executives handsomely, either directly or by subcontracting services to entities that they owned or controlled.  ACS and AssistRx likewise blossomed from startups into thriving for-profit entities, rewarded handsomely by Teva for their assistance.

9.   The scheme has also drawn the attention of the United States Department of Justice.  In August 2020, the Department of Justice sued Teva USA and Teva Neuroscience, alleging that their conduct resulted in violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and False Claims Act, 31 U.S.C. §§ 3729-3733.  *See* https://www.justice.gov/usao-ma/pr/united-states-files-false-claims-act-complaint-against-drug-maker-teva-pharmaceuticals. That suit followed settlements with Teva's co-conspirators: in November 2019, the Justice Department

reached a settlement in which TAF agreed to pay $4 million in exchange for a release of claims for the covered conduct, as well as similar conduct involving other manufacturers and pharmaceutical products, *see* https://www.justice.gov/usao-ma/press-release/file/1218686/download, which was shortly after CDF agreed to pay $2 million for related conduct, *see* https://www.justice.gov/usao-ma/press-release/file/1212996/download.  And in August 2020, ACS agreed to pay $3.5 million to settle claims related to its participation in the Copaxone scheme.  *See* https://www.justice.gov/usao-ma/press-release/file/1304256/download. The United States Department of Health and Human Services, Office of the Inspector General ("OIG") also exercised its supervisory authority, requiring TAF and CDF to enter into separate "Integrity Agreements" designed to reform the foundations' practices and ensure future compliance with the law.

10.     The scheme was designed and executed to circumvent the congressional design of the Medicare system, which requires drug copays and other patient-responsibility obligations to act as a market constraint against increasing prices.  Teva and its co-conspirators removed that constraint by funneling illegal kickbacks through sham charitable funds.  This left American taxpayers—and insurers like Humana—to bear the high prices that Teva set for Copaxone while it reaped the resulting profits for itself and shared those spoils with its co-conspirators.

## II.     PARTIES

### A.  Humana

11.     Plaintiff Humana Inc. is a Delaware corporation with its principal place of business in Louisville, Kentucky.  Humana and its operating subsidiaries provide health insurance, including for prescription drug costs, for more than eight million members in all 50 states, the District of Columbia, and Puerto Rico.  More than 75% of Humana's total premium revenues in the year 2018 were derived from government-led insurance programs, including

Medicare Part D prescription drug coverage, Medicare Advantage plans, Tricare plans for service members, and Medicaid plans.

12. Humana's operating subsidiaries include: Arcadian Health Plan, Inc.; CarePlus Health Plans, Inc.; Cariten Health Plan, Inc.; Cariten Insurance Company; CHA HMO, Inc.; CompBenefits Insurance Company; Emphesys Insurance Company; Health Value Management, Inc. d/b/a ChoiceCare Network; Humana Behavioral Health, Inc.; HumanaDental, Inc.; Humana Benefit Plan of Illinois, Inc.; Humana Employers Health Plan of Georgia, Inc.; Humana Health Benefit Plan of Louisiana, Inc.; Humana Health Company of New York, Inc.; Humana Health Insurance Company of Florida, Inc.; Humana Health Plan of California, Inc.; Humana Health Plan of Ohio, Inc.; Humana Health Plan of Texas, Inc.; Humana Health Plan, Inc.; Humana Health Plans of Puerto Rico, Inc.; Humana Insurance Company; Humana Insurance Company of Kentucky; Humana Insurance Company of New York; Humana Medical Plan of Michigan, Inc.; Humana Insurance of Puerto Rico, Inc.; Humana Medical Plan of Pennsylvania, Inc.; Humana Medical Plan of Utah, Inc.; Humana Medical Plan, Inc.; Humana Pharmacy, Inc.; Humana Pharmacy Solutions, Inc.; Humana Regional Health Plan, Inc.; and Humana Wisconsin Health Organization Insurance Corporation (collectively, the "Operating Subsidiaries").

13. Humana Pharmacy Inc. and Humana Pharmacy Solutions, Inc. operate Humana's in-house pharmacy and manage Humana's pharmacy benefits, respectively. All of the other Operating Subsidiaries are "organized and licensed under State law" of their respective states of incorporation "as a risk-bearing entity eligible to offer health insurance or health benefits coverage in each State in which it offers a Medicare+Choice plan." 42 U.S.C. § 1395w–25(a)(1). All of the Operating Subsidiaries have assigned the claims asserted here to Plaintiff Humana Inc. through written assignment agreements. Under the agreements, the Operating

Subsidiaries "irrevocably assign[ed] all rights, titles, and interests in the Claims to Humana." For purposes of this Complaint only and unless otherwise noted, Humana Inc. and the Operating Subsidiaries are referred to collectively as "Humana."

### B.  Teva

14.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Teva is a subsidiary of Teva Pharmaceuticals Industries Ltd., the largest generic drug manufacturer in the world and one of the fifteen largest pharmaceutical companies worldwide.

15.     Defendant Teva Neuroscience, Inc. is a Delaware corporation with its principal place of business in Overland Park, Kansas.  It is a wholly owned subsidiary of Teva USA.

16.     Teva Neuroscience and Teva USA were individually and collectively involved in the scheme alleged here.  Personnel from both entities proposed, coordinated and approved the payments to CDF and TAF.  In many instances, Teva USA was the source of Teva's payments to the foundations.  In other instances, Teva paid the foundations through Teva Neuroscience.

### C.  ACS

17.     Defendant Advanced Care Scripts, Inc. is a Florida Corporation with its principal place of business in Cincinnati, Ohio.  ACS is a subsidiary of Omnicare Inc., which in turn is a subsidiary of publicly traded CVS Health Corporation.  ACS is a specialty pharmacy that also provides patient-management services to the pharmaceutical industry.  ACS was founded and run by Jeffrey Spafford and Edward Hensley before being sold to Omnicare Inc.

### D.  AssistRx

18.     Defendant AssistRx, Inc. is a Delaware Corporation with its principal place of business in Orlando, Florida.  AssistRx currently provides patient-management services to the pharmaceutical industry and also provides specialty pharmacy services.  During the relevant

period, AssistRx also provided "management services" to TAF.  AssistRx is owned by Messrs. Spafford and Hensley.

### III.    CO-CONSPIRATORS

#### A.  TAF

19.     The Assistance Fund Inc. is a Delaware not-for-profit corporation with its principal place of business in Orlando, Florida.  TAF's primary purpose is to provide copay assistance for expensive pharmaceuticals, including Copaxone.  TAF was founded by Messrs. Spafford and Hensley.

#### B.  CDF

20.     Chronic Disease Foundation, Inc. is a New Jersey not-for-profit corporation with its principal place of business in Frisco, Texas.  CDF currently does business under the name Good Days.  CDF's primary purpose is to provide copay assistance for expensive pharmaceuticals, including Copaxone.

### IV.    JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

22.     This Court has personal jurisdiction over defendants pursuant to 18 U.S.C. § 1965 because they reside, are found, have an agent, or transact their affairs in this district.

23.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over violations of state law, including state common-law claims.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965.  A substantial part of the events giving rise to this action occurred in this judicial district.  Two of the defendants and one of the co-conspirators, all integral to Teva's

scheme, were located in Orlando, Florida.  From at least 2006 until 2015, Teva orchestrated the

Copaxone copayment scheme outlined in this Complaint with ACS, whose principal place of

business during the relevant period was in Orlando.  ACS arranged for the payment of over $325

million by Teva to CDF and TAF, and ACS submitted from its Orlando headquarters many

requests to those foundations for Copaxone copayment subsidies at Teva's behest.  In 2015,

AssistRx, which is also headquartered in Orlando, took over the role of ACS.  TAF was also

headquartered in Orlando, and it received, managed and paid copayments from the hundreds of

millions of dollars in funds it received from Teva, including by making Copaxone copayments

for Humana's members.  Furthermore, Humana has more than 1 million insureds in the state of

Florida and transacts a significant amount of business in this judicial district, including paying

for hundreds of millions of dollars in Copaxone prescriptions that were filled by ACS and other

pharmacies in this judicial district during the relevant period.

**V.     FACTS**

**A.  Legal Framework**

25.     Congress established Medicare in 1965 to provide health insurance coverage for

people aged sixty-five or older and for people with certain disabilities or afflictions.  Medicare is

administered by the Centers for Medicare & Medicaid Services ("CMS"), a division of the

United States Department of Health and Human Services.

26.     In 2006, Medicare launched a voluntary prescription drug benefit program for

Medicare enrollees known as Medicare Part D.  Under this program, Medicare contracts with

insurers like Humana, known as Part D Plan Sponsors, to administer prescription drug plans.  *See*

42 C.F.R. § 423.4.  Premiums for Part D plans are split between insureds and Medicare funds

generated from taxpayers.  The administration of Part D plans is regulated by CMS, pursuant to

one-year, annually renewable contracts.  Part D Sponsors enter into subcontracts with

8

pharmacies or other "downstream entities" to provide prescription drugs to the Medicare Part D insureds enrolled in their plans.  Pharmacies then contract directly with pharmaceutical companies or indirectly through drug distributors to acquire the prescription drugs for Medicare insureds.

27.     Under enabling legislation and relevant regulations, a Part D beneficiary may be required to make a partial payment for the cost of prescription drugs in the form of a copayment, coinsurance, or deductible (collectively "copays").  *See* 42 U.S.C. § 1395w-102.  The copays can be substantial for expensive medications and vary throughout the year, depending on a beneficiary's total Part D covered expenses incurred that year up to that point.  The patient responsibility for prescription drug costs under Medicare can vary between 5% and 100% of the cost of the drug, meaning that patients who take expensive medications like Copaxone are often responsible for thousands of dollars in out-of-pocket costs for that drug alone, in addition to costs for other prescriptions that they may need.

28.     When a pharmacy dispenses drugs to a Humana Part D member, the pharmacy submits a claim to Humana, which in turn submits an electronic record of the claim, called a Prescription Drug Event ("PDE"), to CMS.  After dispensing the drug, the pharmacy receives reimbursement from Humana for the portion of the drug cost not paid by the Part D member at the point of sale.  Generating and submitting PDE data is a condition of payment for CMS's provision of Medicare funds to Part D Plan sponsors.  *See* 42 C.F.R. § 423.322.

29.     Any "downstream" or "related" entities that subcontract with Medicare Part D Plans (including pharmacies dispensing medication and manufacturers selling medication) are required to comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False

Claims Act (31 U.S.C. § 3729, *et seq*.), and the anti-kickback statute (§ 1127B(b) of the Act),"
42 C.F.R. § 423.505(h)(l), and all other federal laws, regulations, and CMS instructions, as well
as any additional contractual obligations assumed by the Part D Plan.  *See* 42 C.F.R.
§ 423.505(i)(3).

30.    CMS regulations require "downstream" entities that generate and submit PDE
claims data to certify that such data is true, accurate, and complete and that the PDE data is the
basis for obtaining federal reimbursement for the healthcare products or services reflected
therein.  *Id*. § 423.505(k).  Congress has determined that any Medicare claim "that includes items
or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or
fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g).

31.    In order to effectuate their scheme, Defendants misrepresented to Humana that
they were complying with state and federal law, including laws related to kickbacks and false
claims such as the Anti-Kickback Statute and False Claims Act.

32.    Teva and its agent ACS made such certifications and therefore directly
misrepresented to Humana that they were not inducing Medicare patients to take Teva's drug by
subsidizing copayments, and that Teva and ACS were otherwise complying with federal law.
AssistRx aided and abetted Teva's violations of the law, including the Anti-Kickback Statute and
False Claims Act, and failed to disclose such violations to Humana.  Teva also made contractual
representations to Humana in connection with its non-Medicare insurance policies that it would
comply with the laws including, among others, those related to fraud, abuse, and prohibiting
kickbacks.

33.    Medicare copays exist to encourage physicians and beneficiaries to be efficient
consumers of federally reimbursed healthcare products, while also encouraging those

manufacturing such products to price them based on market forces such as affordability to consumers and competition from other medications, including lower-cost generic drugs. Manufacturers paying the Medicare copays of those seeking to buy their drug circumvent this congressionally designed check on healthcare costs. As OIG has observed, drug manufacturers paying the Medicare Part D copays of patients taking their products "eliminat[e] a market safeguard against inflated prices." OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625 (Nov. 22, 2005). In other words, charging the Medicare system tens of thousands of dollars while presenting those same drugs to Medicare insureds as free induces insureds to use those drugs over cheaper pharmaceutical and non-pharmaceutical alternatives.

34.    The 2005 OIG guidance explicitly warned against precisely the circumstance that arose in this case:

> Subsidies provided by traditional pharmaceutical manufacturer PAPs have the practical effect of locking beneficiaries into the manufacturer's product, even if there are other equally effective, less costly alternatives (and even if the patient's physician would otherwise prescribe one of these alternatives). Subsidizing Medicare Part D cost-sharing amounts will have this same steering effect. Moreover…cost-sharing subsidies can be very profitable for manufacturers, providing additional incentives for abuse. So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the amount of the cost-sharing assistance, the manufacturer makes a profit. These profits can be considerable, especially for expensive drugs for chronic conditions. We are concerned that pharmaceutical manufacturers may seek improperly to maximize these profits by creating sham "independent" charities to operate PAPs; by colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products (discussed in more detail below); or by manipulating financial need or other eligibility criteria to maximize the number of beneficiaries qualifying for cost-sharing subsidies.

*Id*. at 70626 (emphasis added).

**B.  Humana**

35.     Humana operates or administers Medicare Part D insurance plans on behalf of the federal government for millions of members.  Humana also provides coverage for pharmaceuticals, including Copaxone, through other plans, including Medicare Advantage (Medicare Part C), Tricare, Medicaid, and commercial health insurance plans.  Through its administration of these plans, Humana bears significant risks that the costs and utilization of healthcare services will rise.  When Humana assumes these risks, it relies in large part on the protections afforded by law against submissions of false or fraudulent claims to government healthcare providers.

36.     Humana's agreements with its providers include a provision that requires the provider to certify its compliance with state and federal law, as well as rules promulgated by government entities such as CMS.  These contractual provisions are essential for Humana to ensure that it receives prompt payments and reimbursements from CMS for valid claims, and to ensure that it does not pay invalid claims that might increase costs to both itself and Medicare.

**C.  Copaxone**

37.     Copaxone is an immunomodulator medication used to treat multiple sclerosis. The United States Food and Drug Administration approved Copaxone in 1996, and it subsequently became one of the best-selling drugs in the United States.  Teva Ltd.'s 2017 annual report stated that its Copaxone revenues were $3.8 billion in 2017, $4.2 billion in 2016, and $4.0 billion in 2015.  During the same period, Medicare alone spent over $4.3 billion on Copaxone, equivalent to more than 35% of Teva's global revenues on the drug.

**D.  Teva Directed Medicare Patients to Foundations that it Funded**

38.     It is well known that both physicians and patients consider out-of-pocket costs to be important when selecting a course of treatment.  In one general survey of patients, 27%

reported having entirely avoided filling a prescription due to its cost and 18% reported skipping doses of medication in order to save money.[1]  Another study found that "new prescriptions with copayments of [$100] or more were associated with an abandonment rate of just over 20%."[2]  A study of physician attitudes toward medication costs found that 88% of physicians "felt the cost of medicines was an important consideration in the prescribing decision."[3]  Some commentators in the medical community have even suggested that physicians have an ethical duty to discuss and consider patients' copayments when making prescribing decisions.[4]

39.     Teva recognized that out-of-pocket costs were a significant factor influencing whether patients were prescribed Copaxone in the first place, whether they filled prescriptions for Copaxone, and whether they refilled Copaxone prescriptions over the long term (or, as Teva euphemistically refers to it, how well the patients "adhere" to their Copaxone prescription).  If out-of-pocket costs were high, patients would forego Copaxone in favor of less expensive multiple sclerosis drugs, including generics.  The high prices Teva charged for Copaxone resulted in correspondingly high out-of-pocket costs: because an annual course of treatment could cost over $70,000 per year, patients had to pay thousands of dollars annually for Copaxone alone.  This is on top of the already substantial medical expenses associated with managing a terrible disease like multiple sclerosis.

---

[1] "Healthcare Costs Dampen Patient Engagement Despite Satisfaction," Patient Engagement HIT (May 19, 2016) *available at* https://patientengagementhit.com/news/healthcare-costs-dampen-patient-engagement-despite-satisfaction.
[2] "Prescription Abandonment on the Increase." PharmacoEconomics & Outcomes News, vol. 576, no. 1, at 5 (2009).
[3] Reichert, Steven, Todd Simon, and Ethan A. Halm. "Physicians' attitudes about prescribing and knowledge of the costs of common medications." *Archives of internal medicine,* vol. 160, no. 18, at 2799-2803 (2000).
[4] Riggs, Kevin R., and Peter A. Ubel. "Overcoming barriers to discussing out-of-pocket costs with patients." *JAMA internal medicine,* vol. 174, no.6, at 849-850 (2014).

40.     Instead of lowering the price, Teva subsidized only the comparatively small patient portion while leaving insurers to pay the substantial balance.  For Medicare patients, Teva employees acknowledged that Teva could not do so directly because paying copayments of Medicare insureds would violate the Anti-Kickback Statute and False Claims Act.  Instead, Teva directed patients to charitable foundations that it funded.  This assured both prescribers and insured patients that Medicare, rather than patients, would bear the high costs of Copaxone.  Teva also knew that if it did not follow through on the expectations created by this message that Copaxone sales would decrease as a direct result.

41.     Teva accomplished this messaging and steering of patients to its self-funded foundations through a program it called "Shared Solutions."  Teva told its Copaxone sales team that it should deliver the message that Shared Solutions was "committed to helping ensure that financial concerns do not come between patients and their treatment," and offered support for three separate financial assistance programs: free product, Medicare Part D assistance, and private copay assistance.  Teva also recognized that "Copaxone Patient Assistance Programs remove prescribing barriers and drive[] adherence and compliance."  Physicians who prescribed Copaxone were encouraged by Teva to submit an enrollment form directly to Shared Solutions for each new Copaxone patient.  As a result, Shared Solutions established relationships with the vast majority of Copaxone patients.

42.     Teva understood that the charitable veneer of its contributions to the foundations was a sham.  Its business personnel understood that it made these payments expecting to receive a return on Teva's "investment" in the charitable foundations.  Although Teva personnel have admitted that it had an unwritten policy of not reducing such analyses to writing, examples exist

nonetheless which show that Teva expected to achieve a return on investment ("ROI") of more than 400% on its contributions.

43.     For example, Teva's 2008 Copaxone Work Plan estimated that the company would spend approximately $97 million on "Medicare Financial Assistance" between 2008 and 2011 and that this expenditure would result in the sale of an additional 155,113 units of Copaxone worth nearly $300 million.  Similarly, a 2011 presentation touted that Teva's co-pay program had an average ROI of 451%, with a range of 206% to 761%.

44.     Teva's own tax department decided that it should not even treat the supposed "donations" as charitable, but instead as business expenses associated with marketing or selling Copaxone.  In 2013, a Teva tax manager wrote that "[t]he payments [to foundations] . . . are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense[s]."

45.     Teva made its knowledge and intention known to its co-conspirators.  For example, in an affidavit appended to the Department of Justice's complaint against Teva, ACS's founder, Edward Hensley, averred that he "understood that Teva was purposefully utilizing ACS and structuring its donations to CDF in a manner that essentially ensured that such donations would benefit only Copaxone patients, and not patients who had been prescribed competitor MS medications."  When Teva began paying the "charity" that Mr. Hensley founded, TAF, in addition to CDF, he ensured that Teva "understood that Teva effectively would be able to use TAF as it had CDF: essentially, as a 'pass-through' donation vehicle to get Teva monies into the hands of Copaxone patients."

**E. Teva Conspired with Pharmacies and Foundations to Funnel Hundreds of Millions of Dollars to Boost Copaxone Sales**

46.     From 2006 to 2018, Teva contributed more than $325 million to two ostensibly non-profit foundations: CDF and TAF.  The foundations solicited contributions in order to subsidize patient copayments for expensive drugs, predominantly for Medicare insureds.  Teva's substantial contributions to CDF and TAF were nominally available to any multiple sclerosis patient who met specified criteria, but in reality the donations were orchestrated to ensure that the only patients who benefitted from them took Copaxone rather than other multiple sclerosis drugs.  This was done with the knowledge and support of the foundations, who derived tens of millions of dollars in administrative fees from Teva's contributions.  It was also supported by Teva's co-conspirators ACS and AssistRx, who served as intermediaries.  The coordination by ACS and later AssistRx of contributions with foundation copayment assistance was intended to insulate Teva from legal risk and conceal the true purpose of Teva's contributions.

47.     Soon after Medicare launched prescription drug coverage in 2006, Teva began making contributions to CDF in order to fund copayments for Medicare insureds.  From 2006 through 2014, Teva made 20 donations to CDF totaling more than $94 million.  Teva used CDF because it had policies and procedures in place to ensure that any Teva donations would "pass through" to patients taking Copaxone and would not be diverted to patients who were taking other manufacturers' multiple sclerosis medications.  Teva chose CDF in part because it got "burned" by another charity that used its donations to assist patients who took other manufacturers' multiple sclerosis drugs.  That lack of control over its contributions was unacceptable to Teva.

48.     Teva communicated directly with CDF, including its President Michael Banigan, about funding needs for Copaxone copayments.  Mr. Banigan and his cronies at CDF profited

immensely from their relationship with Teva.  CDF charged Teva—and Teva willingly paid—
"administrative fees" of 9% of Teva's donations.  The vast majority of the "administrative"
expenses incurred by CDF were not for actual administrative costs but rather to pay millions of
dollars in fees to for-profit businesses that Mr. Banigan owned, to pay $47 million to Mr.
Banigan's family trust for CDF to purchase one of Mr. Banigan's businesses, and to pay the high
salaries of Mr. Banigan and other executives.

49.     In late 2013, after an internal investigation by an outside law firm, Mr. Banigan
resigned from CDF and the entire board of the charity was replaced.  Teva's last contribution to
CDF was made in February 2014, shortly after the change in leadership.

50.     Although Teva communicated directly with CDF regarding its donations, it took
certain steps to maintain the appearance of regulatory compliance.  One of those steps was to use
its patient "hub" provider and specialty pharmacy, ACS, as a go-between to coordinate Teva's
donations to CDF.  Teva told doctors to send Copaxone patients to ACS.  This was effective and
resulted in ACS both managing and filling most of Teva's Copaxone prescriptions through its
hub.  This allowed ACS to effectively coordinate Teva's copayment assistance program for
Medicare beneficiaries.  Teva relied on ACS to gather the information it needed to determine
how much and when to "donate" so that its contributions would directly subsidize copayments
for Copaxone and not other drugs.

51.     This occurred in several steps.  ACS would gather information from CDF about
the number of Copaxone patients receiving copayment assistance, which Teva knew it could not
request directly.  ACS would then combine this information with its own knowledge of how
many additional patients it had waiting to fill prescriptions until copayment assistance became
available.  ACS would then share this detailed information with Teva so that it could calculate a

donation comprised of (a) the specific amount needed to provide copayment assistance for Copaxone patients only plus (b) the "administrative fee" for the foundations.  Teva would then notify ACS exactly when the funds were available so that ACS could prepare a "batch" request to the foundation for Copaxone patients on ACS's waitlist for support.  ACS would then relay to Teva the number of Copaxone patients who had been "approved" for copayment funding by the foundation.

52.    Teva's process for preparing donation budgets specifically involved multiplying the estimated number of Medicare patients by "what the typical average Medicare cost per patient might be for a calendar year," and then adding the foundation administrative fees that were "typically somewhere in the nine percent range."  For example, every year from 2007 through at least 2014, Teva consistently followed the practice of using data from the foundations (provided by ACS) to calculate its budgets for TAF and CDF and to pay them what they needed to cover copays for Copaxone patients in the following year.  After Teva made these payments, it then received confirmation from the foundations (again through ACS) that they had covered the Copaxone patients who had sought to renew their annual Medicare copay grants.

53.    The number of patients approved was reliably a very high percentage of what Teva expected based on the information previously provided by ACS and CDF, providing Teva an almost immediate confirmation that it would receive the "return" it expected on its foundation contribution.  Throughout this process CDF, ACS, and Teva were in regular communication.

54.    Teva specifically instructed ACS not to refer otherwise qualified Medicare patients to Teva's Copaxone free-drug program if the foundations were accepting patients.  ACS likewise shifted Medicare-insured patients who were receiving free drugs from Teva to Medicare foundation copay assistance programs.  Teva also had ACS and AssistRx identify patients

receiving free drugs who did not have Medicare coverage, but who were Medicare eligible, to sign up for Medicare so that Teva could avoid giving away free drugs by directing them to the foundation assistance programs instead.  All of this was done for the same purpose: to boost Copaxone profits using taxpayer dollars, and thus to create a pot of gold for the conspirators to share amongst themselves.

55.      ACS aided and abetted Teva's scheme because it too had something to gain. Teva represented a significant source of revenue for ACS, both from fees for managing the Copaxone hub and from filling a large number of Copaxone prescriptions through its specialty pharmacy.  This contributed to the more than $200 million in annual revenues that enabled ACS's co-founders, Messrs. Spafford and Hensley, to sell the company to publicly held Omnicare Inc. in 2008, only two years after founding it.

56.      After the 2008 sale, Spafford and Hensley founded both AssistRx and TAF, which was modeled after CDF.  Teva likewise contributed millions of dollars to TAF, initially under cover of lower administrative fees (and thus higher "returns" on investment for Teva's contributions).  Though TAF initially indicated that it would "use any reserve funds to cover additional [Copaxone] patients," TAF ultimately set its administrative fee at the same 9% level as CDF.  Also like CDF, TAF was rife with insider dealing.  Spafford and Hensley used the newly created AssistRx to generate more than $10 million dollars in "management fees" from TAF, in addition to generous salaries that they paid themselves out of donated funds.

57.      By 2010, Teva was contributing more to TAF than to CDF, and over the next five years more than 80% of Teva's copayment funding dollars went to TAF.  During TAF's first operating year (covering the last half of 2009 and the first half of 2010), Teva donated $20.23 million to TAF for Copaxone copay assistance.  During that same period, TAF reported total

donations of $20.63 million, meaning that Teva accounted for more than 98% of TAF's donations during its first year.  In five of the next six years, Teva accounted for more than half of TAF's total contributions.  Between December 2009 and December 2015, Teva made 46 contributions to TAF totaling $234.4 million.  Until at least 2017, Teva continued to make tens of millions of dollars in contributions to TAF "with the expectation that they would be delivered to Copaxone patients to drive Teva's Medicare sales."[5]  TAF was independent in name only, since Teva's contributions provided tremendous leverage over TAF (and over Messrs. Spafford and Hensley, who controlled it).

58.     TAF gave Teva even greater insight and control over its contributed funds than CDF did.  Messrs. Spafford and Hensley remained close to the personnel at ACS and communications between the participants in Teva's Copaxone scheme became even more frequent and direct.  TAF facilitated more frequent and targeted donations throughout the year, enabling Teva to further encourage sales of Copaxone by reducing patient wait times and avoiding temporary referrals to Teva's free-drug program.

59.     As Teva increased Copaxone's price from $18,000 per year to over $70,000 per year, it created more copayment assistance needs and increased the costs of the copayments it already paid through the foundations.  At times various people within Teva's organization questioned the need for high levels of copayment assistance.  But every time Teva evaluated its copayment contributions, it ultimately chose not to slow or cut its foundation payments because doing so would hurt sales and profits.

---

[5] See "Drug Pricing Investigation: Teva—Copaxone," Staff Report to Committee on Oversight and Reform of the U.S. House of Representatives (September 2020) *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Teva%20Staff%20Report%2009-30-2020.pdf.

60.     For example, in a January 9, 2015 email, Jennifer Clark, an Associate Director in Teva's Patient Services department, warned that if Teva cut its foundation payments, the company's sales forecasts would be "overstated":  "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made."  A few weeks later, on February 2, 2015, Alejandro Castro, a Teva financial analyst, emailed David Loughery, Teva's Vice President of Finance, that "Patient access has also mentioned that they will need between **$5M and $8M in donations** soon to avoid losing an estimated 1,500 Medicare Patients." (Emphasis in original.)  Castro then quantified the dollar value of losing those patients: "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M **per month** associated with reducing donations." (Emphasis added.) Shortly thereafter, instead of cutting the "donations budget," Teva agreed to pay TAF $8.5 million, which was over $2 million more than Teva had previously budgeted.

61.     In August 2015, in another discussion about potentially reducing Teva's future financial support of TAF, Clark reiterated her earlier warning, this time to Ryan Sloss, a Teva finance manager: "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill."  Mr. Sloss concurred: "we either pay it and go over budget or we don't make our sales numbers."

62.     In 2015 the for-profit company wholly owned by Messrs. Spafford and Hensley, AssistRx, took over some or all of the "hub" functions that ACS was performing for Teva. Without skipping a beat, AssistRx continued to facilitate Teva's pass-through of contributed funds to Copaxone patients, including by coordinating donations and funneling information from TAF to Teva.  On information and belief, this arrangement lasted through at least the end of the

year 2018 and further lined the pockets of AssistRx's owners and Teva's collaborators, Messrs.
Spafford and Hensley.

### F. Knowledge, Understanding, and Intention

63.     Teva and its co-conspirators knew that federal law prohibited Teva from covering
a Medicare patient's copay directly.

64.     In addition to facts set forth elsewhere in this Complaint, Teva knew this because
its employees received training and internal materials reflecting OIG guidance that prohibited a
manufacturer from exercising control over patient assistance programs for Medicare insureds,
including OIG's 2005 Special Advisory Bulletin on Patient Assistance Programs for Medicare
Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), and its 2014 Supplemental Special
Advisory Bulletin, Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120 (May
30, 2014).  In the 2005 Special Advisory Bulletin, OIG advised that the Anti-Kickback Statute
applied to payments by pharmaceutical manufacturers to patients through foundations, and
emphasized that a foundation "must not function as a conduit for payments by the
pharmaceutical manufacturer to patients," and that a pharmaceutical manufacturer should not
"solicit or receive data from the charity that would facilitate the manufacturer in correlating the
amount or frequency of its donations with the number of subsidized prescriptions for its
products."  70 Fed. Reg. at 70626-27.

65.     Nevertheless, in December 2011, Teva employees exchanged emails about
information they wanted from CDF.  One stated: "Is there a way to get to total patients in the
fund (what % of the fund is made up of Copaxone patients[])…I don't believe they can provide
this directly but is there some way you can back in to the answer?"  Similarly, in May 2014,
Teva employees acknowledged they weren't "supposed to" obtain Copaxone numbers directly
from a foundation.  The knowledge of culpability was so palpable that Teva's senior leadership

was warned by its own employees that it should "take a reserve" to cover False Claims Act liabilities associated with Teva's donations to CDF and TAF in the event that the donations came under government scrutiny.

66.     The other defendants and co-conspirators likewise had knowledge of the OIG guidance documents.  Their personnel communicated with Teva personnel about compliance requirements.  The foundations in particular were aware of the OIG's requirements, which are publicly available, *see*, *e.g.*, https://oig.hhs.gov/compliance/alerts/bulletins/index.asp, and because both OIG and state attorneys general regularly issued opinion letters and other guidance to charitable foundations about compliance with state and federal law.  The foundations failed to abide by the guidance they received from the OIG.

### G.  Use of the Mails and Wires

67.     Throughout the relevant period, Teva, ACS, CDF, TAF, and AssistRx used thousands of mail and interstate wire communications to create and manage their scheme, which involved nationwide distribution of Copaxone through ACS at the direction of Teva.  Teva communicated with ACS, AssistRx, and the foundations through the mails and wires, causing thousands of reimbursement requests to be submitted to Humana over the wires or by mail, and used the wires and mail to effectuate their receipt of payments and contributions.  For example, from 2006 to 2018 ACS submitted requests to Humana for reimbursement of more than 140,000 Copaxone prescriptions using the wires or the mail.

### H.  Damages

68.     As a result of Teva's multipronged scheme to inflate Copaxone's price and utilization, Humana incurred significant losses.  A substantial portion of Humana's business is evaluating, underwriting, and managing risks involved in insuring healthcare costs.  As an

insurer, Humana bears significant risks associated with utilization and pricing of expensive drugs.

69.     Teva's scheme was designed to cause, and did cause, Humana and others to pay for Copaxone prescriptions that it would otherwise not have reimbursed, and to pay more for prescriptions than it otherwise might have paid.  Humana was among the group of health insurers who were the targets of Teva's scheme.  Teva and its co-conspirators knew that nearly all Copaxone in the United States would be sold to patients with prescription drug insurance that would pay most of the drug's cost.  Humana's insurance plans bore the vast majority of Copaxone's costs for Humana members.  Humana was directly injured as a result of Teva's and its co-conspirators' illegal conduct.

70.     Indeed, Humana's expenditures on Copaxone were closely correlated with Teva's copayment foundation contributions for Copaxone, as depicted in the chart below:



71.     But for the scheme, Humana would have paid for fewer Copaxone prescriptions, and it would have paid less for each covered prescription.  Specifically, but for Teva's ability to raise the prices well above the rate of inflation while incentivizing doctors and patients to choose Copaxone over other multiple sclerosis medications not supported by copay assistance, Humana would have paid lower prices for Copaxone or its members would have selected other, more cost-effective medications.  Similarly, but for Teva's kickbacks, Teva and ACS would not have defrauded Humana by falsely certifying their compliance with federal and state law through submissions for reimbursements for Copaxone prescriptions.

72.     During the relevant period, Humana paid over $1 billion for Copaxone prescriptions, with ACS accounting for nearly $500 million of that spending.  In the absence of Teva's and its collaborators' conduct, Humana would have paid substantially less.  Humana has also incurred administrative, investigative, legal, and other costs as a result of the conduct of Teva and its co-conspirators.

73.     Humana has the relevant information to identify only a fraction of the insureds whose copayments Teva directly subsidized through CDF and TAF.  Over 2,800 claims for Copaxone prescriptions filled directly through Humana's own specialty pharmacy received more than $1.6 million in copayment funding through either CDF or TAF between 2011 and 2015. (Exhibit A, attached, contains information on the claims for Copaxone prescriptions filled through Humana's specialty pharmacy using copayment assistance from CDF and TAF.)  For many more claims where prescriptions were filled through other specialty pharmacies, such as ACS, Humana lacks access to sufficient information to know whether the copayment was paid by the insured, by CDF, or by TAF.  Those claims for which it lacks data on copayment subsidies represent the majority of Humana's spending on Copaxone.

### I.  Fraudulent Concealment of the Illegal Scheme

74.     Teva actively concealed the existence of its illegal scheme and the acts underlying it through false or misleading statements.  Teva concealed its arrangements with CDF and TAF intentionally, and with knowledge of their illegality.  CDF and TAF took steps to disguise the sources of funds they received and to disguise the intent of their donors, suggesting that those donations were made for the benefit of any multiple sclerosis drug, when in fact they were methodically calculated, timed, and coordinated with ACS and AssistRx to provide support only for patients who were prescribed Copaxone.  Teva did this while certifying to Humana that it was following federal law and CMS rules that prohibited such copayment subsidies for Medicare patients.  ACS and AssistRx knowingly aided, abetted, facilitated, and joined in that illegal conduct.

75.     The fraudulent concealment prevented Humana from discovering this conduct. Humana remained unaware of it until the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements.

### COUNT I
### VIOLATION OF THE RICO ACT, 18 U.S.C. § 1962(c)

76.     Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

77.     Defendants are "person[s]" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

78.     Defendants designed and coordinated a multifaceted scheme (the "Copaxone Enterprise") intended to charge and maintain inflated prices for Copaxone, including through a

conspiracy to defraud payors such as Humana. The scheme consisted of illicit patient copay subsidies through sham charitable funds.

79. The pattern of conduct occurred from at least late 2006 through 2018, and would have continued but for the investigations, legal actions, and/or settlements of federal authorities.

80. The Copaxone Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Teva, ACS, AssistRx, CDF, and TAF—including their corporate parents, siblings, subsidiaries, employees, and agents. The Copaxone Enterprise was an ongoing organization that functioned as a continuing unit. The Copaxone Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Teva, ACS, AssistRx, CDF, and TAF are each "persons" distinct from the Copaxone Enterprise.

81. Teva established the Copaxone Enterprise to fraudulently increase its sales of Copaxone. Teva subsidized copays through CDF and TAF in exchange for an increased rate of prescriptions of Copaxone in lieu of less expensive treatment. Defendants knew that their scheme violated federal and state laws.

82. Every Defendant and each of the co-conspirators knowingly participated in the Copaxone Enterprise and conducted the activities relevant to their respective roles in the scheme. Generally, Teva provided contributions to the foundations with the knowledge and intention that its contributions would be used for copay support for Copaxone only. ACS and AssistRx coordinated information from CDF and TAF so that Teva could calculate the donations used for Copaxone support, and it steered patients toward the foundation assistance programs and away from free drug programs. CDF and TAF understood, agreed to, and did use Teva's donations to fund copay assistance only for patients of Copaxone rather than other multiple sclerosis drugs,

27

and it provided information to ACS and AssistRx to enable Teva to calculate the specific amount of those donations.

83.     False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail.  These false representations were made directly to Humana and were a condition of reimbursement for all Copaxone claims submitted to Humana.  The illegally obtained payments were sought through, and sent over, the wires or by mail.  The claims for reimbursement submitted for payment to Humana over the wires or by mail identified in Exhibit A attached to this Complaint are examples of the Copaxone Enterprise's fraud on Humana.

84.     The Copaxone Enterprise engaged in and affected interstate commerce because, among other things, it marketed, sold, purchased, or provided Copaxone to thousands of individuals throughout the United States.

85.     Teva has asserted control over the Copaxone Enterprise by designing, organizing, and funding the phony charitable funds at CDF and TAF used for Copaxone copays.

86.     Teva has conducted, and Defendants and their co-conspirators participated in, the affairs of the Copaxone Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

87.     The effect of Defendants' and their co-conspirators' racketeering activity was to induce sales of Copaxone that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Copaxone to a higher level than it would have commanded in the absence of the illegal conduct.

88.     Humana suffered injuries when it reimbursed those prescriptions for Copaxone that otherwise would not have been made and/or paid the higher prices that resulted from the illegal conduct.

89.     Humana's injuries were directly and proximately caused by Defendants' and their co-conspirators' racketeering activities.

90.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II
## CONSPIRACY TO VIOLATE THE RICO ACT, 18 U.S.C. § 1962(d)

91.     Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

92.     18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

93.     Defendants and their co-conspirators have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Copaxone Enterprise through a pattern of racketeering activity.

94.     Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Humana of money.

95.     The nature of the conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation by conspiring to violate 18 U.S.C. § 1962(c), but also that

they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

96.     As a direct and proximate result of Defendants' and their co-conspirators' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Humana has been injured in its business and property as set forth more fully above.

97.     Defendants and their co-conspirators have sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

      a.   Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346;

      b.   Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346;

      c.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

98.     The purpose and effect of the conspiracy was to induce sales of Copaxone that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Copaxone to a higher level than it would have commanded in the absence of the illegal conduct, and thereby to create profits that could be shared among the conspirators.

99.     Humana suffered injuries when it reimbursed those prescriptions for Copaxone that otherwise would not have been made and/or paid the higher prices that resulted from the illegal, conspiratorial conduct.

100.    Humana's injuries were directly and proximately caused by Defendants' and their co-conspirators' racketeering activities.

101.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

<u>**COUNT III**</u>
**STATE UNFAIR COMPETITION LAW CLAIMS**

102.   Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

103.   Defendants have engaged in fraudulent and deceptive business practices that violate the state unfair competition laws of Alaska, Arizona, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, South Carolina, Tennessee, Washington, Wisconsin, and Wyoming.

104.   Defendants have engaged in unfair competition under the states' laws by unlawfully making and accepting remuneration in exchange for the sale of Copaxone to Humana and its members in consumer transactions.  This conduct violated the federal Anti-Kickback Statute and equivalent state statutes and caused the certifications of compliance with law provided to Humana to be fraudulent.

105.   Humana was directly and proximately injured by Defendants' and their co-conspirators' conduct and would not have paid what it did for Copaxone had they fully disclosed their schemes.

106.   Defendants and their co-conspirators engaged in wrongful conduct while at the same time obtaining under false pretenses a significant sum of money from Humana.  Humana suffered injury in fact and actual damages, including lost money and property as a result of Defendants' and their co-conspirators' violations of the following statutes:

     a.   **Alaska.**  Defendants have engaged in unfair methods of competition in the conduct of trade or commerce, in violation of **Alaska Stat. § 45.50.471(a)**, *et seq.*  Humana suffered an ascertainable loss of money and/or property as a result of Defendants' unfair methods of competition.

b. **Arizona.** Defendants have engaged in unfair acts or practices in connection with the sale of Copaxone, in violation of **Ariz. Rev. Stat. Ann. § 44-1521,** *et seq.* Humana has suffered damages as a result of Defendants' unfair acts or practices.

c. **Arkansas.** Defendants have engaged in unconscionable trade practices in violation of **Ark. Code Ann. § 4-88-101,** *et seq.* Humana has suffered an actual financial loss as a result of Defendants' use of such practices, and Humana's loss was proximately caused by those practices.

d. **California.** Defendants have engaged in unfair business acts in violation of **Cal. Bus. & Prof. Code § 17200,** *et seq.* Humana has suffered a loss or deprivation of money or property that was the result of Defendants' unfair business practices.

e. **Connecticut.** Defendants have engaged in unfair methods of competition and/or unfair acts or practices in the conduct of trade or commerce, in violation of **Conn. Gen. Stat. § 42-110a,** *et seq.* Humana has suffered an ascertainable loss of money or property as a result of Defendants' unfair methods, acts, and/or practices.

f. **Florida.** Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair acts or practices in the conduct of trade or commerce, in violation of **Fla. Stat. § 501.201,** *et seq.* Humana has suffered a loss as a result of Defendants' violations.

g. **Idaho.** Defendants have engaged in unfair methods of competition and/or unfair acts or practices in the conduct of trade or commerce, in violation of **Idaho Code Ann. § 48-601,** *et seq.* Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unlawful methods, acts, or practices.

h. **Illinois.** Defendants have engaged in unfair methods of competition in violation of **815 Ill. Comp. Stat. 505/1,** *et seq.* Defendants' unfair methods of competition involved trade practices that were addressed to the market generally.

i. **Indiana.** Defendants have engaged in unfair acts or practices in violation of **Ind. Code § 24-5-0.5-1,** *et seq.,* in connection with consumer transactions.

j. **Louisiana.** Defendants have engaged in unfair methods of competition in violation of **La. Rev. Stat. Ann. § 51:1401,** *et seq.* Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unfair acts or practices.

k. **Maryland.** Defendants have engaged in unfair trade practices in violation of **Md. Code Ann., Com. Law § 13-101,** *et seq.* Humana has suffered injury and loss as a result of Defendants' unfair trade practices.

l. **Massachusetts.** Defendants have engaged in unfair methods of competition in violation of **Mass. Gen. Laws Ann. ch. 93A, § 1,** *et seq.* Humana engages in the conduct of commerce and has suffered a loss of money or property as a result of Defendants' unfair methods of competition.

m. **Michigan.** Defendants have engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce in violation of **Mich. Comp. Laws § 445.901,** *et seq.* Humana has suffered a loss as a result of Defendants' unlawful acts or practices.

n. **Nebraska.** Defendants have engaged in unfair methods of competition in violation of **Neb. Rev. Stat. § 59-1601,** *et seq.* Humana has been injured in its property by Defendants' unfair methods of competition.

o. **New Hampshire.** Defendants have engaged in unfair methods of competition in violation of **N.H. Rev. Stat. Ann. § 358-A:1,** *et seq.* Humana has been injured by Defendants' use of unlawful methods, acts, or practices.

p. **New Jersey.** Defendants have engaged in unconscionable commercial practices, in connection with the sale of Copaxone, in violation of **N.J. Stat. Ann. § 56:8-1,** *et seq.* Humana has suffered an ascertainable loss of moneys and property as a result of Defendants' use or employment of unlawful methods, acts, or practices.

q. **New Mexico.** Defendants have engaged in unfair trade practices and/or unconscionable trade practices in the conduct of trade or commerce, in violation of **N.M. Stat. § 57-12-1,** *et seq.* Humana has suffered a loss of money or property as a result of Defendants' employment of unlawful methods, acts, or practices.

r. **North Carolina.** Defendants have engaged in unfair methods of competition in or affecting commerce, in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.* Humana has been injured by reason of Defendants' violations of this statute.

s. **North Dakota.** Defendants have engaged in unconscionable and/or substantially injurious acts or practices in connection with the sale of Copaxone, in violation of **N.D. Cent. Code § 51-15-01,** *et seq.* Defendants have acquired moneys and/or property from Humana by means of Defendants' unlawful practices.

t. **Oregon.** Defendants have engaged in unconscionable acts in connection with the sale of Copaxone, in violation of **Or. Rev. Stat. 646.607,** *et seq.* Humana has suffered an ascertainable loss of money or property as a result of Defendants' willful use or employment of unlawful methods, acts, or practices.

u. **South Carolina.** Defendants have engaged in unfair methods of competition in violation of **S.C. Code Ann. § 39-5-10,** *et seq.* Humana has suffered an

ascertainable loss of money or property as a result of Defendants' use or employment of unfair methods, acts, or practices.

v. **Tennessee.**  Defendants have engaged in unfair acts or practices affecting trade or commerce in violation of **Tenn. Code Ann. § 47-18-101,** *et seq.* Humana has been the victim of Defendants' unfair acts in the course of trade or commerce.

w. **Washington.**  Defendants have engaged in unfair methods of competition in violation of **Wash. Rev. Code § 19.86.010,** *et seq.*  Humana has been injured in its business or property by Defendants' violation of this statute.

x. **Wyoming.**  Defendants have engaged in unfair acts or practices in violation of **Wyo. Stat. Ann. § 40-12-101,** *et seq.*  Humana has suffered damages as a result of Defendants' unlawful trade practices.

107.    Pursuant to these states' laws, Humana seeks judgment in its favor and against Defendants requiring Defendants to pay restitution of wrongful profits, revenues, and benefits received as a result of the Copaxone schemes.

## COUNT IV
## STATE CONSUMER FRAUD AND
## DECEPTIVE TRADE PRACTICE LAW CLAIMS

108.    Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

109.    Defendants have engaged in fraudulent and deceptive business practices that violate the state consumer fraud, consumer protection, and/or deceptive trade practices laws of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, and Wisconsin, and in particular the following laws:

a. **Arizona.**  Defendants have engaged in deceptive acts or practices in connection with the sale of Copaxone, in violation of **Ariz. Rev. Stat. Ann. § 44-1521,** *et seq.*  Humana has suffered damages as a result of Defendants' deceptive acts or practices.

34

b. **Arkansas.**  Defendants have engaged in deceptive trade practices in violation of **Ark. Code Ann. § 4-88-101,** *et seq.*  Humana has suffered an actual financial loss as a result of Defendants' use of such practices.

c. **California.**  Defendants have engaged in fraudulent business acts in violation of **Cal. Bus. & Prof. Code § 17200,** *et seq.*  Humana has suffered a loss or deprivation of money or property that was the result of Defendants' unfair business practices.

d. **Colorado.**  Defendants have engaged in deceptive trade practices in violation of **Colo. Rev. Stat. § 6-1-101,** *et seq.*  Humana has been injured as a result of Defendants' deceptive trade practices.

e. **Connecticut.**  Defendants have engaged in deceptive acts or practices in the conduct of trade or commerce, in violation of **Conn. Gen. Stat. § 42-110a,** *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' deceptive acts or practices.

f. **Florida.**  Defendants have engaged in deceptive acts or practices in the conduct of trade or commerce, in violation of **Fla. Stat. § 501.201,** *et seq.* Humana has suffered a loss as a result of Defendants' violations.

g. **Georgia.**  Defendants have engaged in deceptive acts or practices in the conduct of consumer transactions, in violation of **Ga. Code Ann. § 10-1-390,** *et seq.*  Humana has suffered injury and/or damages as a result of Defendants' violation of this statute.

h. **Illinois.**  Defendants have engaged in deceptive acts or practices in violation of **815 Ill. Comp. Stat. 505/1,** *et seq.*  Defendants' deceptive acts or practices involved trade practices that were addressed to the market generally.

i. **Indiana.**  Defendants have engaged in deceptive acts or practices in violation of **Ind. Code § 24-5-0.5-1,** *et seq.,* in connection with consumer transactions.

j. **Louisiana.**  Defendants have engaged in deceptive acts or practices in violation of **La. Rev. Stat. Ann. § 51:1401,** *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of deceptive acts or practices.

k. **Maryland.**  Defendants have engaged in deceptive trade practices in violation of **Md. Code Ann., Com. Law § 13-101,** *et seq.*  Humana has suffered injury and loss as a result of Defendants' deceptive trade practices.

l. **Massachusetts.**  Defendants have engaged in deceptive acts or practices in violation of **Mass. Gen. Laws Ann. ch. 93A, § 1,** *et seq.*  Humana engages in the conduct of commerce and has suffered a loss of money or property as a result of Defendants' deceptive acts or practices.

m. **Michigan.** Defendants have engaged in deceptive methods, acts, or practices in the conduct of trade or commerce in violation of **Mich. Comp. Laws § 445.901,** *et seq.* Humana has suffered a loss as a result of Defendants' unlawful acts or practices.

n. **Minnesota.** Defendants have engaged in fraud, misrepresentation, misleading statements and/or deceptive practices, with the intent that others rely thereon in connection with the sale of Copaxone, in violation of **Minn. Stat. § 325F.68,** *et seq.*

o. **Nebraska.** Defendants have engaged in deceptive acts or practices in violation of **Neb. Rev. Stat. § 59-1601,** *et seq.* Humana has been injured in its property by Defendants' deceptive acts or practices.

p. **Nevada.** Defendants have engaged in deceptive trade practices in violation of **Nev. Rev. Stat. § 41.600,** *et seq.*

q. **New Hampshire.** Defendants have engaged in deceptive acts or practices in violation of **N.H. Rev. Stat. Ann. § 358-A:1,** *et seq.* Humana has been injured by Defendants' use of unlawful methods, acts, or practices.

r. **North Carolina.** Defendants have engaged in deceptive acts or practices in or affecting commerce, in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.* Humana has been injured by reason of Defendants' deceptive acts or practices.

s. **South Carolina.** Defendants have engaged in deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10,** *et seq.* Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of deceptive methods, acts, or practices.

t. **Tennessee.** Defendants have engaged in deceptive acts or practices affecting trade or commerce in violation of **Tenn. Code Ann. § 47-18-101,** *et seq.* Humana has been the victim of Defendants' deceptive acts in the course of trade or commerce.

u. **Wisconsin.** Defendants and their agents have made unfair, deceptive and/or misleading statements in connection with their sales of Copaxone to Humana and its members in violation of **Wis. Stat. § 100.18,** *et seq.* Humana has suffered monetary damages as a result of Defendants' deceptive unfair, deceptive and/or misleading statements.

110. Humana is a person or consumer entitled to protection under the foregoing state laws.

111.    Defendants and their co-conspirators misrepresented to Humana that they were complying with federal and state laws, including laws against kickbacks and false claims to the government.

112.    Defendants and their co-conspirators intended for payors, such as Humana, to rely on these certifications.  The intention may be inferred by the very nature of the representation, whose sole purpose is to procure payment for Copaxone.

113.    These representations and certifications were made in an effort by Defendants to sell Copaxone to the consuming public, and were addressed to the market generally by having Copaxone paid for at inflated prices by Medicare, Medicaid, and third-party payors, such as Humana.  The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare and raising the cost of insurance.

114.    Humana relied on these misrepresentations, which were material to its decision to pay for Copaxone treatments, to its detriment.

115.    Humana was directly and proximately injured by Defendants' conduct, suffered an injury in fact, and suffered actual, ascertainable damages.  Humana would not have paid for as many Copaxone prescriptions, and/or would have paid less for each covered prescription, had Defendants refrained from engineering the false representations or otherwise disclosed their schemes.

116.    Defendants' conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

## COUNT V
## STATE INSURANCE FRAUD CLAIMS

117.   Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

118.   Defendants have committed insurance fraud in violation of the laws of Illinois, Kentucky, Pennsylvania, New Jersey, and Tennessee, and in particular the following laws:

a.   **Illinois.**  In violation of **720 Ill. Comp. Stat. 5/17-10.5**, Defendants knowingly obtained, attempted to obtain, or caused to be obtained, by deception, control over the property of Humana by the making of false claims or by causing false claims to be made on policies of insurance issued by Humana, intending to deprive Humana permanently of the use and benefit of that property.

b.   **Kentucky.**  In violation of **Ky. Rev. Stat. § 304.47-010,** ***et seq.***, Defendants knowingly and with intent to defraud or deceive presented or caused to be presented, or prepared with knowledge or belief that they would be presented to Humana, written or oral statements as part of, or in support of, claims for payment or other benefits pursuant to insurance policies issued by Humana. Defendants made such statements knowing the statements contained false, incomplete, or misleading information concerning facts of things material to the claims.  Humana was damaged as a result of Defendants' violations.

c.   **Pennsylvania.**  In violation of **18 Pa. Cons. Stat. Ann. § 4117**, Defendants knowingly and with the intent to defraud Humana presented or caused to be presented to Humana statements forming parts of, or in support of, claims that contained false, incomplete or misleading information concerning facts or things material to the claims.  Humana was damaged as a result of Defendants' violations.

d.   **New Jersey.**  In violation of **N.J. Stat. § 17:33A,** ***et seq.***, Defendants presented or caused to be presented written or oral statements as part of, or in support of or opposition to, claims for payment or other benefits pursuant to insurance policies, knowing that the statements contained false or misleading information concerning facts or things material to the claims.  Humana was damaged as a result of Defendants' violations.

e.   **Tennessee.**  In violation of **Tenn. Code Ann. § 56-53-101,** ***et seq.***, Defendants presented, caused to be presented, or prepared with knowledge or belief that they would be presented, by or on behalf of insureds to Humana in connection with insurance transactions, information Defendants knew to contain false representations, or representations the falsity of which Defendants recklessly disregarded, as to material facts, or withheld or concealed material facts, concerning claims for payments or benefits pursuant to insurance policies.

119.     Defendants knowingly presented or caused to be presented to Humana statements in support of claims for insurance benefits for Copaxone that they knew contained false and/or misleading information.  Defendants knew and intended that by engaging in their schemes to illegally subsidize copayments through phony charitable funds that misleading and/or false information would be submitted to Humana and other Medicare payors in connection with insurance claims.  Defendants knew that the presentation of false claims to Humana was essential to their scheme.

120.     The compliance certifications and other information submitted to Humana were material to Humana's decision to reimburse claims for Copaxone.  Without them, Humana would not to have paid these claims.

121.     Humana's injuries were directly and proximately caused by the false or misleading statements that Defendants made to it, or caused to be submitted to it, as described above.

<u>COUNT VI</u>
**BREACH OF CONTRACT**

122.     Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

123.     Humana Inc. and Teva Neuroscience Inc. are parties to a contract dated February 21, 2006 with an effective date of July 1, 2005 in which Humana promised to cover Teva's Copaxone on its commercial (non-Medicare) insurance formulary and provide it with a preferred position.  In exchange, Teva Neuroscience agreed to pay rebates on Humana's purchases of Copaxone.

124.     In connection with the agreement, Teva Neuroscience represented that it "shall comply with all applicable laws related to this Agreement, including, but not limited to, laws

related to fraud, abuse, discrimination, disabilities, confidentiality, self-referral, false claims and prohibition of kickbacks."

125.    During the relevant period, Humana and Teva entered into subsequent agreements under the same or materially similar terms.

126.    Teva Neuroscience breached its promise to comply with the laws relating to fraud, abuse, false claims and prohibition of kickbacks when it engaged in the copayment scheme described in this Complaint.

127.    As a result of that breach, Humana has been injured and has suffered damages.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

128.    Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

129.    Humana had valid and enforceable written contracts with each of its members who were prescribed Copaxone during the relevant period.  Humana offers plans to individuals and families, groups and employers, and Medicare and Medicaid beneficiaries.  Humana has numerous insurance contracts with its insured members which vary by state and by plan type. *See, e.g.*, https://www.humana.com/individual-and-family/products-and-services/medical-plans/sample-policies.  Humana's insurance plans require the *insured person(s)* to pay a copayment or other cost-sharing amount when obtaining medical products or services, including prescription medications.  *See, e.g.*, Exhibit B at 131 ("*Copayment* means the **amount to be paid by** *you* toward the cost of each separate prescription or refill of a covered prescription drug"); *id.* ("*Cost share* means any *copayment*, *deductible*, *drug deductible*, and/or percentage amount that *you* **must pay per prescription drug or refill per year**.); *id.* at 131 ("**You are responsible for any and all** *cost share***, when applicable, for** *specialty drugs*, according to the 'Schedule of

benefits – specialty drugs' provision of this section."); *id.* at 131-135 ("***You* are responsible for the following** . . . [**25-50%**] *copayment* per *specialty drug prescription* or refill"); *id.* at 134 ("If the *cost share* applied to *your* claim is waived by *your pharmacy* or health care provider, ***you* are required to inform us. Any amount, thus waived and <u>not</u> paid by *you*, would <u>not</u> apply to any *out-of- pocket limit*.**") (italics and underline in original, bold added).  The purpose of this copayment or cost sharing obligation is to provide an incentive to members to exercise patient responsibility for healthcare costs, and so to help control healthcare spending and manage runaway drug price inflation.

130.    Under its contracts, Humana also retains the right to determine whether and how much of a claim should be paid for prescription drugs based, in part, on "Medicare laws, regulations, manuals, and other related guidance" pursuant to its procedures for claims processing.  *See id* at 10 (describing Humana's ability to make "claims processing edits").  Humana notes that the list of specialty drugs covered by its plan is "subject to change without notice."  *See id.* at 132.

131.    This copayment obligation was known to Teva, ACS, and AssistRx.  Teva accounted for copayment obligations in its sales and marketing strategy.  ACS and AssistRx were aware of Humana members' copayment obligations through their role as managers of Teva's Copaxone hub and/or because they directly collected these copayments from Humana's members when filling prescriptions.

132.    Defendants intended to and did induce Humana members to breach their obligations by making copayments for them.

133.    Humana was harmed by these breaches because it reimbursed claims for Copaxone that otherwise would not have been made.

134.    Defendants have intentionally and willfully interfered with the contracts between Humana and its members.  This interference was a significant factor in causing the breach of the contracts.  This interference was improper, lacked justification, and was not a legitimate part of the business of Teva, ACS, or AssistRx.

135.    Humana suffered actual damages as a result of this interference, both by paying for more Copaxone prescriptions than it otherwise would have, and by paying more for each covered prescription.

136.    Humana seeks judgment in its favor and against Defendants, requiring Defendants to pay monetary and punitive damages for their conduct.

### COUNT VII
### FRAUD

137.    Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

138.    Defendants have engaged in a pattern of fraudulent conduct that has occurred over an extended period of time.  Because of the nature of the fraud and the number of acts constituting the fraud, Humana lacks detailed knowledge of all the circumstances surrounding the fraud.  Nevertheless, Humana has identified certain instances, including those listed in Exhibit A attached to this Complaint, as examples of Defendants' fraudulent conduct.

139.    Defendants schemed to mislead Humana through both false statements and fraudulent omissions.  The false statements were in the form of certifications from Teva and ACS that were transmitted to Humana in the form of electronic requests for reimbursement of prescription drug costs for Copaxone.  TAF and CDF made misstatements or omissions in their communications with Humana involving material facts regarding their charitable purpose, Teva being the source of their copayment assistance funds used for Copaxone, and the circumstances

under which CDF and TAF acquired those funds from Teva. Defendants knew that those statements were false and that their omissions were material to Humana in its decisions whether to reimburse claims for Copaxone prescriptions.

140.    By submitting claims and providing copayment subsidies while omitting material information, Defendants intended to and did induce Humana's reliance on their statements when making decisions regarding coverage and filling of Copaxone prescriptions for its insureds.

141.    Humana was damaged by acting in reliance on this false, misleading, omitted, or incomplete information. Defendants and their co-conspirators gained a benefit by selling, filling, or earning administrative fees on subsidies for Copaxone prescriptions that they otherwise would not have received had they been honest and forthright.

**COUNT VIII**
**CONSPIRACY TO COMMIT FRAUD**

142.    Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

143.    There was an agreement between Teva and its co-conspirators to obtain funds by fraudulent means, including as more particularly described in Count VII of this Complaint.

144.    Teva and its co-conspirators committed overt acts in pursuance of the conspiracy, including but not limited to the timing and coordination of patient referrals, donations, and administrative fee payments.

145.    Humana suffered damage as a result of the acts done under the conspiracy.

**COUNT IX**
**UNJUST ENRICHMENT**

146.    Humana incorporates by reference paragraphs 1–75 of this Complaint as though fully stated in this paragraph.

147.   As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants and their co-conspirators have profited and benefited from payments Humana made for Copaxone as a result of their schemes.

148.   The circumstances of Defendants' receipt of monies based on the conduct set forth in this Complaint are such that, in equity and good conscience, Defendants should not retain such monies, the amount of which is to be determined at trial.

149.   Humana is entitled in equity to seek restitution of Defendants' wrongful profits, revenues, and benefits received as a result of their schemes.

150.   Humana states this claim to the extent that it is deemed not to have an adequate legal remedy.

## **PRAYER FOR RELIEF**

151.   Based on the foregoing, Humana requests that the Court enter an order that:

a.   Enters judgment in favor of Humana and against the Defendants;

b.   Awards Humana its actual damages in an amount to be determined at trial;

c.   Awards Humana punitive damages;

d.   Awards Humana treble damages under 18 U.S.C. § 1964(c) or any other provision of law, including state law, that permits doubling or trebling of damages;

e.   Awards Humana its attorneys' fees and litigation costs under 18 U.S.C. § 1964(c), or any other provision of law, including state law, that permits recovery of such costs and fees;

f.   Awards Humana pre-and post-judgment interest; and

g.   Provides any other relief that the Court deems proper.

## **JURY DEMAND**

152.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: January 8, 2021

/s/ *Dennis P. Waggoner*

Dennis P. Waggoner
Florida Bar No. 509426
dennis.waggoner@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 East Kennedy Boulevard, Suite 3700
Tampa, Florida 33601
Telephone: (813) 221-3900
Fax: (813) 221-2900

Scott C. Solberg*
James W. Joseph*
Benjamin E. Waldin*
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
Email: ssolberg@eimerstahl.com
        jjoseph@eimerstahl.com
        bwaldin@eimerstahl.com

*Pro hac vice* applications forthcoming

*Attorneys for Plaintiff Humana Inc.*