| UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION | |
|---|---|
| HUMANA INC., Plaintiff, v. TEVA PHARMACEUTICALS USA, INC., *et al.*, Defendants. | Case No. 6:21-cv-72-Orl-41DCI |

## TEVA DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Defendants Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc. (collectively, "Teva") hereby move, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss the Complaint (ECF No. 1) filed by Plaintiff Humana, Inc.

## I.    INTRODUCTION

Humana's Complaint challenges Teva's donations to the patient assistance programs ("PAPs") of two independent charitable foundations.  Those foundations used Teva's donations, along with those from other pharmaceutical companies, to help financially needy multiple sclerosis ("MS") patients afford their medications—including Teva's Copaxone.  Copaxone dramatically improves the lives of MS patients and was prescribed by physicians as the appropriate and necessary course of treatment well before the receipt of any charitable assistance.  Yet, in the guise of a racketeering claim, Humana, a sophisticated insurer that knows exactly which medications it covers and at what price, seeks to overturn physicians' medical judgments and avoid

covering critical medication for its insureds.

Humana's *post hoc* efforts to avoid coverage must be dismissed on numerous grounds. First, nearly all of Humana's causes of action are time-barred. Humana was on notice of any potential claims no later than December 2013, more than seven years before Humana commenced this lawsuit, and Humana has alleged no particularized factual allegations of conduct or injury after 2015.

Second, Humana does not state a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Under Eleventh Circuit precedent, Humana has not satisfied its burden to allege "plausible economic injury" where its reimbursement decisions result from its own "sophisticated actuarial decisions." Moreover, the chain of causation is severed by the many layers of independent decisions between Teva's conduct, and the fact that any harm Humana allegedly suffered is merely derivative of the harm allegedly suffered by the government. Nor does Humana plausibly allege that Teva engaged in criminal racketeering activity under RICO. Humana's allegations fall far short of alleging a mail or wire fraud scheme. Instead, they amount to nothing more than vague contentions that Teva improperly certified compliance with law in an unrelated contract in 2006.

Finally, Humana's kitchen sink approach to pleading state law claims fails. Humana has not alleged an underlying violation of law or any actionable fraudulent or deceptive conduct entitling Humana to relief. It also has otherwise failed to plead the requisite facts to sustain its claims.

## II.   BACKGROUND

### A.   Copaxone Treats Multiple Sclerosis, A Life-Altering Disease.

Teva develops, manufactures, and markets high quality generic and specialty pharmaceuticals, including Copaxone.   (Compl. ¶¶ 14, 37 (hereinafter "¶_").) Copaxone is an injectable medicine used for the treatment of MS.  (¶ 37.)  MS is a life-altering disease of the brain and spinal cord that causes often-disabling physical symptoms.  While there is no cure for MS, Copaxone slows the progression of MS, decreases the degenerative impact on the patient, and reduces the frequency of relapses in patients with relapsing-remitting MS.[1]

### B.   The Existence of and Need for Pharmaceutical Company-Funded Charitable Support Has Long Been Well-Recognized.

Prior to and since Medicare Part D's enactment, pharmaceutical companies, including Teva, helped patients bridge the gaps in their insurance coverage by making charitable donations to PAPs.  As the Wall Street Journal reported in 2005, the "biotechnology revolution" led to "miracle" products for patients suffering from life-altering   disorders   developed   through   a   "complex,   expensive   process."[2]

---

[1] *See Multiple sclerosis - Symptoms & causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269 (last visited Apr. 1, 2021), attached as Ex. A to Alison Tanchyk's Declaration in Support of Teva's Motion to Dismiss ("Tanchyk Decl."); *Medications for Multiple Sclerosis*, *Web*MD, https://www.webmd.com/multiple-sclerosis/ms-drug-treatments (last visited Apr. 1, 2021), attached as Ex. B to *Id*; U.S. Food & Drug Admin., Highlights of Prescribing Information for Copaxone (2009), attached as Ex. C to *Id.*  The court may judicially notice a fact that is not subject to reasonable dispute. *See* Fed. R. Evid. 201(b)(2); *Decovich v. Anthem Life Ins. Co.*, 744 F. App'x 466, 467 (9th Cir. 2018).

[2] Geeta Anand, *Through Charities, Drug Makers Help People – and Themselves*, Wall St. J. (Dec. 1, 2005, 12:01 AM ET), https://www.wsj.com/articles/SB113339802749110822., attached as Ex. D to Tanchyk Decl.

Pharmaceutical company donations to patient assistance charities, including those by Teva, provided an important safety net for the high cost of these medications.  As one Medicare beneficiary explained to the WSJ: "I feel grateful every day for [the PAP] and the companies that support them."[3]

After the implementation of Medicare Part D in 2006, the federal government, through HHS OIG, issued a Special Advisory Bulletin that explicitly recognized the need for financial support by industry in the context of Medicare Part D.[4]  The OIG acknowledged that "PAPs[] have long provided important safety net assistance to patients of limited means who do not have insurance coverage for drugs, typically serving patients with chronic illnesses and high drug costs[,]" and that the passage of Medicare Part D did not obviate the need for this "important safety net."[5] It thus provided guidance to assist manufacturers in continuing to provide this assistance while avoiding federal Anti-Kickback Statute ("AKS") risks.

Teva, for its part, used its Shared Solutions program to help patients determine if they were Medicare Part D eligible, and if so, referred them to independent third-party companies that help register a patient for Medicare coverage and, where appropriate and necessary, assisted the patient in obtaining charitable foundation support.  (¶ 41.)  From October 2006 to February 2015, the third party with which Teva contracted was Defendant Advanced Care Scripts ("ACS").  (¶ 24.)  In 2015,

---

[3] *Id.*
[4] *See* 70 Fed. Reg. 70623-03, 70626 (Nov. 22, 2005) ("2005 OIG Guidance"), attached as Ex. E to Tanchyk Decl.
[5] *Id.* at 70625.

Teva contracted with Defendant AssistRx, which Humana alleges "upon information and belief" continued through 2018.  (¶ 62.)

The charitable foundations at issue are CDF and TAF.  (¶ 4.)  As the OIG concluded, "pharmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, bona fide charitable assistance programs."[6] OIG explicitly determined as to both CDF and TAF that their structure interposed an independent, bona fide charitable organization between donors and beneficiaries in a manner that insulates beneficiary decision-making from information attributing their funding source to any particular donor.[7]

### C.    PAP Programs and Ensuing Investigations Were Widely Reported.

Teva's contributions to PAPs have been widely reported for years.  As early as 2005, a Teva employee was quoted by the Wall Street Journal explaining that Teva contributed to a PAP because some patients would not otherwise be able to afford co-payments for Copaxone, which at the time retailed for approximately $18,000 annually.  The Wall Street Journal highlighted the tension between charitable donations to PAPs and the price of the medications: "by donating money, firms keep patients insured and medicine prices high."[8]  This is fundamentally what Humana complains of in this lawsuit filed almost 16 years later.

On October 19, 2013, Barron's reported on the close relationship between

---

[6] 2005 OIG Guidance, 70 Fed. Reg. at 70626.
[7] *See* OIG Adv. Op. No. 06-10 (Sept. 14, 2006) ("CDF Op."), attached as Exhibit F to Tanchyk Decl.; OIG Adv. Op. No. 10-07 (May 26, 2010) ("TAF Op."), attached as Ex. G to Tanchyk Decl.
[8] *Anand, supra*, attached as Ex. D to Tanchyk Decl.

Questcor (now Mallinckrodt) and CDF, an alleged co-conspirator according to Humana, and questioned how closely CDF had abided by OIG guidance regarding kickbacks.[9]  Then on December 18, 2013, the New York Times reported that CDF "is now in turmoil after questions have arisen about its relationship with a pharmaceutical company [Questcor (now Mallinckrodt)] that is itself under investigation for its marketing practices."[10]  The Times further reported that CDF had hired outside counsel to assess its compliance with legal requirements, and quoted CDF's counsel as saying, though CDF was not yet under investigation or the focus of the investigation of Questcor, "an investigation may be coming."[11]  Adding to the growing scrutiny, the New England Journal of Medicine published a July 2014 article explaining that "[PAPs] may lead to higher drug prices…."[12]  "Like Medicare," the author observed "private insurers have tried to discourage participation in [PAPs]…. Judges have dismissed lawsuits brought by insurers against pharmaceutical manufacturers, rejecting the claim that assistance programs offer illegal bribes to patients."[13]

In the following years, it was widely reported that DOJ had issued subpoenas to other manufacturers regarding their charitable donations to PAPs that supported

---

[9] Bill Alpert, *Too Close for Comfort?,* Barron's, Oct. 19, 2013, attached as Ex. H to Tanchyk Decl.
[10] Andrew Pollack, *Drug Maker's Donations to Co-Pay Charity Face Scrutiny*, N.Y. Times (Dec. 18, 2013), https://www.nytimes.com/2013/12/19/business/shake-up-at-big-co-pay-fund-raises-scrutiny-on-similar-charities.html, attached as Ex. I to Tanchyk Decl.
[11] *Id.*
[12] David H. Howard, Ph.D., *Drug Companies' Patient-Assistance Programs — Helping Patients or Profits?*, N.E. J. Med. (July 10, 2014), attached as Ex. J to Tanchyk Decl.
[13] *Id.*; *see also, e.g., Am. Fed'n of State v. Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 346-47 (S.D.N.Y. 2013) (granting motion to dismiss RICO and other claims against pharmaceutical manufacturer based on provision co-pay subsidies).

their medications.  For example, in October 2015, numerous press reports appeared that DOJ had issued a subpoena to Valeant Pharmaceuticals regarding its donations to patient assistance programs.[14]  In 2016, Gilead Sciences, Biogen, Horizon, and Jazz Pharmaceuticals each publicly reported receiving similar subpoenas.[15]  In 2016, as reported by Bloomberg, Celgene was accused in a publicly filed lawsuit of using charitable donations to gain "billions" from U.S. taxpayers through its donations to CDF.[16]  *See also United States v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1057 & n.33 (C.D. Cal. 2016) (granting summary judgment in favor of Celgene because it did not control disposition of CDF's funds).

In early 2017, Regeneron, Pfizer, and J&J each disclosed subpoenas in what was then being reported as DOJ's ongoing "patient assistance dragnet" out of the U.S. Attorney's Office for the District of Massachusetts.[17]  In March 2017, after years of attention regarding pharmaceutical charitable donations, DOJ issued a subpoena to

---

[14] Vidya L. Nathan, *Valeant gets DOJ subpoena over Bausch & Lomb payments*, Reuters, Oct. 26, 2015, https://www.reuters.com/article/valeant-pharms-subpoena/valeant-gets-doj-subpoena-over-bausch-lomb-payments-idUSL1N12Q1HR20151026, attached as Ex. K to Tanchyk Decl.; Dani Kass, *Valeant Says Feds Probing Its Financial Assistance Program*, Law360 (Oct. 15, 2015, 3:36 PM EDT), https://www.law360.com/articles/714578., attached as Ex. L to *Id.*

[15] Eric Palmer, Feds ask Gilead, Biogen, Jazz for info on ties to charities, FiercePharma (May 27, 2016, 10:53 AM), https://www.fiercepharma.com/pharma/feds-ask-gilead-biogen-jazz-for-info-ties-to-charities, attached as Ex. M to Tanchyk Decl.

[16] Ben Elgin and Robert Langreth, *Celgene Accused of Using Charities 'Scheme' to Gain Billions*, Bloomberg (Aug. 1, 2016, 3:11 PM), https://www.bloomberg.com/news/articles/2016-08-01/celgene-accused-of-using-charities-in-scheme-to-gain-billions, attached as Ex. N to Tanchyk Decl.

[17] Tracy Staton, *J&J joins Pfizer, Celgene, Biogen and more in DOJ's patient-assistance dragnet*, FiercePharma (Feb. 28, 2017, 9:07 AM), https://www.fiercepharma.com/pharma/j-j-joins-pfizer-celgene-biogen-et-al-feds-patient-assistance-dragnet, attached as Ex. O to Tanchyk Decl.

Teva regarding its donations.[18]  Three and a half years later, in August 2020, DOJ filed a complaint against Teva in the District of Massachusetts, No. 20-cv-11548.  Teva has moved to dismiss that case on the grounds that the complaint fails to state a violation of the AKS and False Claims Act ("FCA") because, *inter alia*, the government cannot allege that Teva controlled the charities' ultimate disposition of donated funds.[19]

Finally, on January 11, 2021, after years of actual or constructive knowledge of potential claims, and long after its duty to investigate potential claims arose, Humana, one of the largest for-profit insurance companies in America with more than $77 billion in revenue in 2020,[20] filed suit.

## III.   LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Fraud must be pled with particularity.  Fed. R. Civ. P. 9(b).

## IV.   ARGUMENT

### A.   Nearly All of Humana's Claims Are Time-Barred.

Humana purports to bring 58 claims[21] across ten counts based upon Teva's

---

[18] *See* Teva Pharmaceuticals Indus. Ltd. 6-K (May 11, 2017) ("On March 21, 2017, Teva received a subpoena from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs.), attached as Ex. P to Tanchyk Decl.

[19] *See* Teva's Oct. 19, 2020 Mot. to Dismiss, No, 20-cv-11548 (D. Mass.) (ECF No. 23); *see also Celgene Corp.*, 226 F. Supp. 3d at 1057.

[20] *Humana Reports Fourth Quarter 2020 Financial Results; Provides Full Year 2021 Financial Guidance*, Humana, https://humana.gcs-web.com/static-files/b1a244fd-a889-4159-8c64-3c634fb7d6f4 (last visited Apr. 1, 2021), attached as Ex. Q to Tanchyk Decl.

[21] Humana fails to identify the Wisconsin statute in Count 3, which requires dismissal.  *See Cox v. HOVG, LLC*, 2015 WL 4127668, at *1 (M.D. Fla. July 7, 2015).  For present purposes, Teva assumes Humana intends to proceed under Wis. Stat. Ann. § 133.01, *et seq.* for Count 3.

charitable donations.  *See* Appendix A.  Nearly all of these claims are time-barred.[22]

### 1.   Humana Was on Inquiry Notice of Its RICO Claims And 15 State Law Claims No Later Than 2013.

"The statute of limitations for [federal] civil RICO actions is four years," which "begins to run when the injury was or should have been discovered[.]"  *Lehman v. Lucom*, 727 F.3d 1326, 1328, 1330 (11th Cir. 2013) (internal quotation mark omitted).  In addition to its two RICO claims, Humana also brings 15 claims under state laws with statutes of limitations that begin to run from when the injury was or should have been discovered (the "State Law Inquiry Notice Claims").[23]  Those claims have limitations periods ranging from 2 to 6 years from inquiry notice.  *See* Appendix A.

The inquiry notice standard does not require actual knowledge of claims—rather, courts consider whether a plaintiff exercising "reasonable diligence" could have discovered the basis for its claims.  *See, e.g.*, *Consejo De Defensa Del Estado De La Republica De Chile v. Espirito Santo Bank,* No. 09-20613-CIV, 2009 WL 10668758, at *4 (S.D. Fla. Nov. 13, 2009).[24]  Press reports and related government investigations into

---

[22] For present purposes, Teva does not dispute that Humana's five state law claims with a six-year statute of limitations from accrual are timely to the extent they are based on Humana's allegations regarding Teva's conduct in 2015.  *See* Appendix A.  Those claims, however, fail because Humana has not pled any underlying fraud or plausible economic injury under *Ironworkers*.  *See infra* §§ III(B)(1), (3).

[23] *Lehman v. Lucom*, 727 F.3d 1326, 1328, 1330 (11th Cir. 2013) (Civil RICO Act and Conspiracy to Violate RICO Act, Counts 1 and 2); Alaska Stat. § 45.50.531(f) (Count 3); Ga. Code Ann. § 10-1-401(a) (Count 4); Minn. Stat. § 541.05(6) (Count 4); Nev. Rev. Stat. Ann. § 11.190(2)(d) (Count 4); N.H. Rev. Stat. § 358-A:3(IV-a) (Counts 3 and 4); N.M. Stat. Ann. § 37-1-4 (Count 3); Or. Rev. Stat. § 646.638 (Count 3); S.C. Code Ann. § 39-5-150 (Counts 3 and 4); Tenn. Code Ann. § 47-18-110 (Counts 3 and 4); Wyo. Stat. Ann. § 40-12-109 (Count 3); Fla. Stat. §§ 95.031(2)(a), 95.11(3)(j) (common law fraud, Count 7*). For the Court's ease of reference, these cites are also repeated in Appendix A.

[24] *See also Consejo De Defensa Del Estado De La Republica De Chile v. Espirito Santo Bank*, No. 09-20613-CIV, 2010 WL 11505983 (S.D. Fla. Mar. 22, 2010) (denying reconsideration in relevant part).

potential misconduct give rise to inquiry notice.  *See, e.g., Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 970 (11th Cir. 2007) (noting the "'possibility of fraud' is all that is required for inquiry notice, 'not full exposition of the scam itself'").  In *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1281 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010), for example, plaintiffs were put on notice by "the publication of [an] article" from which they acquired "knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights [have] been infringed."  (internal citation omitted).

Here, there were prominent news reports relating to CDF in 2013, multiple and highly publicized disclosures of a DOJ investigation and subpoenas in 2015 and 2016, and a related lawsuit alleging misconduct by CDF decided in 2016, and multiple litigations prior to 2016 challenging the legality of donations to PAPs and related copay support.  *See supra* at § II(C).  The content of these publications and lawsuits put Humana on notice and triggered its duty to investigate whether its rights had been infringed no later than December 2013.  As a result, Humana's RICO and State Law Inquiry Notice Claims are time-barred.

> ### 2.   Nearly All of Humana's Remaining State Law Claims Are Barred by the Statute of Limitations Because Humana Has Not Pleaded Harm Within the Limitations Periods.

Of Humana's 41 remaining state law claims, 36 are based on limitations periods between one and five years from when the claim accrued, typically when the alleged injury occurred.  *See* Appendix A.  Humana has not pled injury within the applicable

limitations periods.  It alleges *no conduct* by any Teva employee after August 2015, let alone particular conduct that caused it injury.  (¶ 61.)  Nor does Humana plead any particular reimbursements for Copaxone prescriptions related to CDF or TAF funding beyond 2015.  (¶ 73.)

The crux of Humana's claim of wrongful conduct is that Teva used data from ACS or AssistRx to calibrate donations and made false certifications of compliance with all laws.  But, there are no allegations that Teva used data from the foundations to calculate its donation amounts after 2014.  (¶ 52.)  In fact, the only allegations concerning post-2014 conduct are that in 2015, Teva allegedly acknowledged that if it stopped making donations, Copaxone sales would fall.  (¶¶ 60-61.)

Humana's allegation that Teva continued to make donations to TAF through 2017 or 2018 (¶¶ 57, 62)[25] is similarly insufficient.  That allegation is based on a Congressional report stating that Teva's donations from 2016 to 2018 "***appear*** to have continued to be made with the expectation that they would be delivered to Copaxone patients[.]"[26]  But Teva's expectation that its donations would drive Copaxone sales does not render false Teva's representation of compliance with laws or constitute an AKS violation.  Humana alleges no factual basis for its contention that *any* donations in 2016, 2017, or 2018 violated *any* law—rather, it simply relies on the "expectation" allegation of the congressional report without setting forth the plausible factual basis

---

[25] Humana separately pleads "on information and belief" that the alleged conduct "lasted through at least the end of the year 2018" (¶ 62) or alternatively "until at least 2017" (¶ 57).

[26] *Id.* n.5 (citing Staff Report to Committee on Oversight and Reform of the U.S. House of Representatives (September 2020)) (emphasis added).

that any wrongful conduct occurred after 2015.   That does not satisfy *Twombly*'s "plausibility" standard, much less the more stringent Rule 9(b) standard that applies to the fraud-based claims.   *See Bruce v. U.S. Bank, N.A.*, No. 8:17-CV-2023-T-33JSS, 2017 WL 6406904, at *3 (M.D. Fla. Dec. 15, 2017) ( "[C]onclusory statement[s] do[] not supply the Court with any information that could lead to the conclusion that the … claim is timely."); *City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1318 (S.D. Fla. 2016) (conclusory allegations are insufficient to plead unlawful conduct within the limitations period).

Accordingly, Humana's claims with statute of limitations of five years or fewer from the date of the alleged injury are untimely and should be dismissed.

### 3.   Humana Fails To Plead Fraudulent Concealment.

Humana attempts to plead around this facial untimeliness with a conclusory invocation of the doctrine of fraudulent concealment.   (¶¶ 74-75.)   But, fraudulent concealment must be pleaded with particularity under Rule 9(b).   *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, No. 14-20107-CIV, 2014 WL 1745050, at *7 (S.D. Fla. Apr. 30, 2014).   In other words, Humana "must plead facts establishing that [Teva] deliberately and actively concealed the material facts for the purpose of inducing [Humana] to delay filing this action."   *Id.; see also Hill v. Texaco, Inc.*, 825 F.2d 333, 335 (11th Cir. 1987) (requiring allegations of "*affirmative* actions by the defendant constituting concealment") (emphasis added).   Allegations of a mere failure to disclose, without more, will not suffice.   *See Speier-Roche*, 2014 WL 1745050 at *7 ("allegations amount[ing] to a claim of mere 'nondisclosure' … under Florida law,

[are] legally insufficient" to invoke the doctrine of fraudulent concealment).

Humana falls far short of meeting this standard.  The only purported fact alleged is that Teva generally represented compliance with the all laws a 2006 "non-Medicare" contract.  (¶¶ 123, 124.)  Humana cites no conduct relating to Medicare, nor any "time and place details" or other facts following 2006.  Nor does it allege any concealing conduct by Teva after Humana was on inquiry notice of its claims, and thus had a duty to investigate.  *See Hill*, 825 F.2d at 335-336 (rejecting plaintiff's fraudulent concealment argument where plaintiff was on inquiry notice of defendant's alleged wrongdoing).  Humana's remaining allegations concerning Teva's "concealment" of its relationship with CDF and TAF, (¶ 74), are conclusory allegations of nondisclosure, which are insufficient.  *See Speier-Roche*, 2014 WL 1745050 at *7; *Greenberg v. Miami Children's Hosp. Rsch. Inst., Inc.*, 264 F. Supp. 2d 1064, 1073 (S.D. Fla. 2003) (rejecting a "bare contention" of fraudulent concealment).[27]

## B.    Humana Fails to State a RICO Claim.

Courts have "an obligation" "to flush out" defective RICO allegations, such as Humana's, "at an early stage of the litigation."  *DeBoskey v. SunTrust Mortgage, Inc.*, No. 8:14-cv-1778-MSS-TGW, 2017 WL 4083557 (M.D. Fla. Sept. 14, 2017).[28]  Teva

---

[27] Similarly, Humana's facially untimely claims cannot be saved by the equitable tolling doctrine because, as discussed above, Humana cannot be deemed to have been reasonably diligent in pursuing its claims.  *See Armbrister v. Roland Int'l Corp.*, 667 F. Supp. 802, 825 (M.D. Fla. 1987) (equitable tolling does not apply in absence of reasonable diligence).

[28] The RICO statute provides a civil remedy to parties "injured in [their] business or property by reason of" a RICO violation.  18 U.S.C. § 1964(c).  Humana's RICO claim against Teva requires plausible

respectfully submits that the Court should do so here because (1) Humana's claims fail under Eleventh Circuit precedent, (2) Humana cannot satisfy RICO's proximate causation requirement, and (3) Humana has not alleged and cannot plausibly allege that Teva engaged in fraudulent, criminal racketeering.

### 1.    Humana Cannot Allege Economic Injury Under *Ironworkers*.

The Eleventh Circuit's precedential decision in *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals* requires dismissal here.  634 F.3d 1352 (11th Cir. 2011). In *Ironworkers*, health insurers asserted civil RICO, state-law consumer protection, and common law claims against a drug manufacturer, alleging that the manufacturer had engaged in fraud through off-label marketing, leading physicians to prescribe its more expensive drug instead of cheaper alternatives and, by extension, causing insurers "to unnecessarily pay" for those prescriptions.  *Id.* at 1355-57.  The Eleventh Circuit affirmed dismissal of all of the insurers' claims because the insurers, like Humana, did not and could not allege "plausible economic injury arising from their payments" for the drug.  *Id.* at 1364.  Economic injury, the court explained, is a necessary element of the insurers' RICO and state law claims.  *Id.* at 1359-60.  But that essential element is missing where "health insurers enter into a contractual bargain with enrollees" in which they "assum[e] the risk of payment for enrollees' future health care costs" in exchange for "a 'premium,' an up-front fee that represents the price of the insurance

---

allegations that Teva "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts," *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (discussing 18 U.S.C. § 1962(c)), or that Teva conspired to do the same, 18 U.S.C. § 1962(d).

policy." *Id.* The court characterized insurers as "making a conscious gamble with profitability: will the premiums they receive be sufficient to cover the risks they have assumed?" *Id.* at 1364-65. If insurers' premiums fall short of actual health care cost payments, "their own business mistakes caused their loss." *Id.* at 1368. Under the Eleventh Circuit's view, "the risk that fraud … might result in insurers paying for medically unnecessary or inappropriate prescriptions is just another cost to be factored into premiums." *Id.* Accordingly, Teva, as a matter of law, "cannot be held to reinsure [Humana's] sophisticated actuarial decisions" and therefore Humana has not met its pleading burden and its Complaint should be dismissed. *See id.* at 1369.

### 2.    Humana Fails to Plead Proximate Causation.

RICO provides a private right of action only to a "person injured in his business or property *by reason of* a violation" of a RICO predicate act. 18 U.S.C. § 1964(c) (emphasis added). Stating a RICO claim requires allegations that a predicate act was both the "but for" and proximate cause of the plaintiff's injury. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see also Hemi Group, LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 6 (2010); *Ray*, 836 F.3d at 1349. Humana cannot satisfy RICO's proximate causation requirement because: (1) there are many layers of independent decision-making between Teva's alleged fraud and Humana's harm; and (2) any harm Humana allegedly suffered is derivative of the harm purportedly suffered by the government.

First, Humana cannot satisfy RICO's proximate causation requirement because the many layers of independent decision-making between Teva's alleged conduct and Humana's alleged injury "eviscerate[] the chain of causation necessary to demonstrate

a RICO violation." *Ironworkers*, 634 F. 3d at 1370 (Martin, J., concurring).  Courts in the Eleventh Circuit and elsewhere have repeatedly rejected RICO claims against drug manufacturers for lack of proximate causation based on such layers, including a physician's independent medical judgment.  *Ironworkers*, 634 F. 3d at 1362.[29]

Humana has alleged nothing to suggest that such independence was in any way compromised by Teva.  While Humana alleges that it "is well known" that doctors and patients consider out-of-pocket costs "important when selecting a course of treatment," (¶ 38), Humana does not allege that lower-cost alternatives to Copaxone were available or that any prescription for Copaxone was not medically necessary.  Indeed, had there been such alternatives, Humana easily could have excluded coverage for Copaxone on its formularies in lieu of such alternatives.  *See Ironworkers*, 634 F. 3d at 1366.  But Humana did not.  Instead, years after scrutiny of PAPs began, it seeks to use Teva's donations as a *post hoc* guise to recover payments for a medically necessary drug for its insureds.

Second, Humana's claims are rooted in an allegation that Teva's charitable donations violated the AKS (¶ 31), which is a theory already being pursued by the government.  Where a RICO plaintiff is not an "immediate victim," and its claims are

---

[29] *See, e.g.*, *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401 (11th Cir. 2011); *Sidney Hillman Health Ctr. of Rochester v. Abbot Laboratories*, 873 F.3d 574 (7th Cir. 2017); *Sergeants Benevloent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71 (2d Cir. 2015); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010); s*ee also Plumbers & Pipefitters Local 572 Health & Welfare Fund v. Merck & Co.*, 2014 U.S. Dist. LEXIS 90313, at *14 (D.N.J. June 30, 2014) (dismissing RICO claim for lack of proximate causation where co-pay subsidies are "'too 'attenuated' from Plaintiffs' injury to support a RICO claim").

derivative of harm allegedly suffered by the government, dismissal is warranted.[30] Allowing suits by those injured indirectly would open the door to "massive and complex damages litigation" that would "burde[n] the courts" and "undermin[e] the effectiveness" of RICO.  *Ray*, 836 F.3d at 274.

### 3.    Humana Fails to Allege "Racketeering Activity."

Humana bases its RICO claims on a DOJ complaint filed against Teva in the District of Massachusetts alleging violations of the FCA, 31 U.S.C. §§ 3729-33, and the AKS, 42 U.S.C. § 1320a-7b.  (*See* ¶¶ 9, 29-31.)  But violations of the FCA and the AKS are *not* "racketeering activity" capable of supporting a RICO claim.  18 U.S.C. § 1961(1).  Humana thus attempts to shoehorn its vague allegations that Teva certified compliance with law (¶¶ 71, 74, 123-125) into a federal claim based on purported wire fraud, mail fraud, and, potentially, bribery (¶ 86).  Humana has failed to allege racketeering activity for several reasons.

First, courts regularly reject efforts to use RICO as an end run around Congress' decision to circumscribe the relief available for violations of other statutes.  *See, e.g.*, *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521 (11th Cir. 2000) (violation of National Traffic and Motor Vehicle Safety Act not indictable as mail or wire fraud to support RICO claim); *Danielsen v. Burnside-Ott Aviation Training Center, Inc.*, 941 F.2d 1220,

---

[30] *See Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493-95 (4th Cir. 2018) ("[T]he injury for which a plaintiff may seek damages under RICO cannot be contingent on or derivative of harm suffered by a different party."); *Barr Labs. v. Quantum Pharmics, Inc.*, No. 90 Civ. 4406, 1994 WL 1743983, at *7 (E.D.N.Y. Feb. 7, 1994) ("In this case the injured party is the FDA and though [plaintiff] was injured because of the injury done to the FDA, its injuries are indirect and remote.").

1222 (D.C. Cir. 1991) (Service Contract Act). When Congress omits a statute from the definition of "racketeering activity" and does not create a private right of action (as with the AKS, *see Ameritox, Ltd. v. Millenium Laboratories, Inc.*, 803 F.3d 518, 522 (11th Cir. 2015)) or limits the available relief (as with the FCA, *see* 31 U.S.C. §§ 3729(a)(1)(G) (civil penalties), 3730 (*qui tam* actions), it is clear that Congress "did not intend for a violation of [such statute] to be the basis for a private civil RICO action, which would permit unlimited, treble damages." *Ayres*, 234 F.3d at 522.

Second, Humana has not plausibly alleged criminal mail or wire fraud, which require pleading: "1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs, 2) that they did so willingly and with an intent to defraud, and 3) that the defendants used the U.S. mails or the interstate wires for the purpose of executing the scheme." *In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d 1323, 1328 (S.D. Fla. 2011) (quotations omitted). Humana's complaint lacks allegations that give rise to a "strong inference" that Defendants had an intent to defraud Humana, *Cont'l Cas. Co. v. Cura Grp., Inc.*, 2005 U.S. Dist. LEXIS 51116, at *71 (S.D. Fla. Apr. 5, 2005), and does not plead the required "who, what, when, where, and how" of any purported fraudulent scheme. *Lacroix v. W. Dist. of Kentucky*, No. 14-24384-CIV, 2014 WL 11412888, at *3 (S.D. Fla. Nov. 19, 2014), *aff'd*, 627 F. App'x 816 (11th Cir. 2015); *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316-17 (11th Cir. 2007) (affirming RICO claim dismissal under Rule 9(b)).

Humana's claim is that unspecified "certifications" of compliance with the law were false because Teva violated federal law when it hoped and expected that its

donations would support Medicare patients taking Copaxone.  (*See, e.g.*, ¶¶ 60-61, 71, 123-125.)  But, Humana does not allege any factual basis to infer, let alone that gives rise to a "strong inference," that Teva intended to defraud Humana.  Rather, Humana describes the alleged scheme in the passive voice without specifying the "time and place of and person responsible for" alleged statements.  *Ambrosia*, 482 F.3d at 1316-17; *see, e.g.,* ¶ 83 (alleging false representations "were made to Humana" and that illegal payments "were sought through, and sent over, the wires or by mail").  Humana comes forward only with a single representation in a 2006 contract relating to "*non-Medicare*" coverage.  (¶¶ 31, 123 (emphasis added).)  Humana does not specify how that 2006 representation could support fraud claims spanning the decade that followed.  Nor has Humana alleged *any communications* between Teva and Humana relating to fraudulent *Medicare* reimbursements—let alone with the particularity required to satisfy Rule 9(b).  *See In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d at 1330 (dismissing RICO complaint where Plaintiffs failed to allege: "1) what specific statements or representations made by Defendant constituted fraud; 2) when those statements were made; or 3) who made them[]").

Humana's attempt to bridge the gap between the insufficiently pleaded 2006 representation and subsequent alleged misrepresentations through improper group pleading does not satisfy Rule 9(b).  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) ("[T]he complaint should inform each defendant of the nature of his alleged participation in the fraud."); *In re Auto Body Shop Antitrust*

*Litig.*, No. 6:14-CV-6006-ORL-31, 2015 WL 4887882, at *6 (M.D. Fla. June 3, 2015) (dismissing complaint due to "improper group pleading").  Humana alleges generally that unspecified "Defendants misrepresented to Humana that they were complying with state and federal law," but Humana does not allege *which* Defendant made the representations, *to whom* they were made, *what* those misrepresentations were, *when* they were made, *where* they were made, and *how* they were communicated.  (¶ 31; *see also* ¶¶ 32, 94-95, 111, 114.)[31]  Accordingly, Humana's RICO claims—and its other fraud-based state law claims—should be dismissed.

Third, even if Humana could satisfy Rule 9(b), Humana has failed to plead that Teva's conduct did not comply with federal law.  A drug manufacturer "***cannot be liable*** for giving money to co-pay foundations" unless its donations "were ***contingent*** on the foundation's ***agreement*** to purchase or recommend [the manufacturer's] drugs." *Celgene Corp.*, 226 F. Supp. 3d at 1057 (emphasis added) (finding no such agreement where CDF reimbursed ten different multiple myeloma drugs, only three of which were manufactured by Celgene); *see also* CDF Op. at 8 (pharmaceutical manufacturer's support of charitable funds that support its own product does not violate the AKS); TAF Op. at 8 (same).  Humana has not alleged that Teva's donations were contingent

---

[31] Moreover, Humana does not allege any misrepresentations about the price Teva charged for Copaxone or about Copaxone itself.  Rather, Humana "received exactly what [it] paid for." *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).  Failing to disclose pricing practices is not a predicate "scheme to defraud." *See Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308 (11th Cir. 2000); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid … do not violate the mail or wire fraud statutes").

upon CDF's or TAF's agreement to recommend Copaxone, so any alleged "certifications" of compliance with the law were not fraudulent (and would have in fact been accurate).[32]

Because Humana has not pleaded a substantive RICO violation, its RICO conspiracy claim (Count 2) also fails. *See Jackson v. BellSouth Telecomm'ns*, 372 F.3d 1250, 1269 (11th Cir. 2004).[33]

### C. Humana's State Law Claims Should Be Dismissed.[34]

Humana alleges that Teva made a general representation of legal compliance in an unrelated contract, and uses that bare allegation to try to plead violations of 24 states' unfair competition laws (Count 3), 21 states' consumer fraud laws (Count 4), five states' insurance fraud laws (Count 5), and common law claims for breach of contract (Count 6), tortious interference (Count 7), fraud and conspiracy to commit

---

[32] Humana also makes the conclusory allegation that the complaint alleges conduct that is also indictable under the Travel Act, 18 U.S.C. § 1952, presumably as commercial bribery. (*See* ¶¶ 86, 97(c).) Beyond a parenthetical characterizing the conduct as "(use of interstate facilities to conduct unlawful activity)," Humana does not articulate what "unlawful activity" is alleged. The pleading therefore fails to give "fair notice" of the claim, *Twombly*, 550 U.S. at 555, let alone plausibly allege conduct indictable under 18 U.S.C. § 1952. *Cf. Plumbers & Pipefitters Local 572 Health & Welfare Fund*, 2014 U.S. Dist. LEXIS 90313, at *14 (granting motion to dismiss commercial bribery claim regarding pharmaceutical manufacturer's co-pay subsidy where there is no fiduciary relationship between insured and insurers or other essential elements).

[33] Humana also fails to allege a plausible RICO "enterprise" because it has not pleaded facts showing that the ultimate purpose of Teva's dealings with independent third-party charities CDF and TAF, and the patient support vendors ACS and AssistRx, was fraudulent rather than commercial. *Ray*, 126 F. Supp. 3d at 1339; *see also Cisneros*, 975 F.3d at 1211 ("where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct").

[34] Humana incorrectly numbers tortious interference and fraud both as "Count VII." For clarity, Count VII (Fraud) is referred to as Count 7*.

fraud (Counts 7* & 8), and unjust enrichment (Count 9).[35]   Humana has not alleged any fraudulent conduct or "plausible economic injury" and therefore for the reasons stated above, dismissal is required.   *See Ironworkers*, 634 F.3d at 1360, 1369 (affirming dismissal of various state law claims where insurer assumed risk of fraud).   Humana's state claims also fail for additional reasons.

### 1.   Many of Humana's Unfair Competition Claims and Consumer Fraud Claims are Legally Deficient.

Humana purports to sue under nine laws (Arizona, Arkansas, Georgia, Illinois, Maryland, New Jersey, Tennessee, and Wyoming) where the right of action is limited to patients who use the medication.[36]   Humana also sues under two laws (Minnesota

---

[35] As a threshold matter, Humana has failed to allege what laws it purports to sue under for its common law claims for breach of contract, tortious interference, fraud, conspiracy, and unjust enrichment. (Counts 6, 7, 7*, 8, and 9).   For this reason alone, dismissal is warranted.   *See Twombly*, 550 U.S. at 555 (a complaint must give "fair notice").   Teva assumes for purposes of this motion that Humana is suing under Florida law.   *Cf. Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1059 (11th Cir. 2007) (noting conflict of law rules).

[36] *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (holding Ariz. Rev. Stat. §§ 44- 1521, *et seq.* did not protect the plaintiff from conduct in which defendant engaged during the course of a transaction with a third-party); *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 2018 Ark. 149, 5, 544 S.W.3d 536, 539 (2018) (holding Ark. Code Ann. §§ 4-88- 101, *et seq.* did not protect plaintiff because it did not use the defendant's services); *Williams v. Jet One Jets, Inc.*, 755 F. Supp. 2d 1281, 1289 (N.D. Ga. 2010) (holding Ga. Code Ann. § 10-1-390, et seq. only protects against "breach[es] of [] dut[ies] owed to the consuming public"); Ga. Code Ann. § 10-1-392(6) (stating only a "natural person" qualifies as a "[c]onsumer"); *Century Universal Enterprises, Inc. v. Triana Dev. Corp.*, 158 Ill. App. 3d 182, 198, 510 N.E.2d 1260, 1270-71 (1987) (emphasizing  815 Ill. Comp. Stat. 505/1, *et seq.* is not "intended to extend to every transaction between contracting practices" and holding that it did not protect plaintiff, who was not a user to the defendant's services); *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 807 (N.D. Ill. 1996) (holding Ind. Code §§ 24-5-0.5-1, *et seq.* did not protect plaintiff because it "resold" rather than "used" the defendant's goods); *Boatel Indus., Inc. v. Hester*, 77 Md. App. 284, 302, 550 A.2d 389, 398-99 (1988) (holding plaintiff was "disqualified from recovering . . . [because] he does not qualify as a 'consumer.'"); *Morris v. Osmose Wood Preserving*, 340 Md. 519, 540–41, 667 A.2d 624, 635 (1995) ( "A sale of consumer goods under the CPA is . . . a sale in which the buyer intends to use the [purchased] goods primarily for [personal] purposes"); *MSP Recovery*

and Wisconsin) that do not provide for a private right of action for damages.[37]   In addition, Humana sues under three laws (Alaska, Nevada, and Nebraska) where the alleged conduct is statutorily exempt.[38]  Each of these claims should be dismissed.

## 2.    Humana's Breach of Contract Claim Should Be Dismissed.

Humana contends that Teva breached a contract dated February 21, 2006 that related to Humana's "commercial ([*i.e.*,] non-Medicare) coverage."  (¶ 123.)  Humana offers no explanation for how a contract that relates to "non-Medicare" reimbursements has been breached through the conduct alleged, which Humana itself describes as a "scheme to bilk Medicare and its contract insurers."  (¶ 1.)  Therefore

---

*Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-CV-2211-BRM-LHG, 2019 WL 1418129, at *18 (D.N.J. Mar. 29, 2019) (holding third party payors are not protected by N.J. Stat. Ann. §§ 56:8-1, *et seq.*, because they "do not use . . . prescription medications themselves"); *Operations Mgmt. Int'l, Inc. v. Tengasco, Inc.*, 35 F. Supp. 2d 1052, 1058 (E.D. Tenn. 1999) (holding Tenn. Code Ann. §§ 47- 18- 101, *et seq.* only applies to "consumer transactions"); Tenn. Code Ann. § 47-18-103 (stating only a "natural person" can qualify as a "consumer"); Wyo. Stat. Ann. § 45-12-105 (prohibiting parties from engaging in unfair business practices "in connection with a consumer transaction"); Wyo. Stat. Ann. § 40-12-102(ii) (defining "consumer transaction" to mean . . . [the] sale . . . of any merchandise to an individual for purposes that are primarily personal").  For the Court's ease of reference, these cites are also repeated in table form in Appendix B.

[37] *See Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000) (holding a party must satisfy a "public benefit requirement" to bring suit under Minn. Stat. § 325F.68, *et seq.*); *Buetow v. A.L.S. Enters., Inc.*, 888 F.Supp.2d 956, 960-61 (D. Minn. 2012) (holding a party does not satisfy the "public benefit requirement" when it seeks recovery of private damages); *PTP OneClick, LLC v. Avalara, Inc.*, 413 F. Supp. 3d 1050, 1069 (W.D. Wash. 2019) (holding a party only has standing to sue under Wis. Stat. § 100.18, *et seq.* when its claim involves a misuse of a professional license or "a violation of a general or special order issued pursuant to Sections 100.20(2)(a) or 100.20(3)").

[38] Alaska Stat. Ann. § 45.50.481 (stating §§ 45.50.471(a), *et seq.* does not apply to an act or transaction regulated by a statute or . . . by the state); *Smallwood v. Cent. Peninsula Gen. Hosp.*, 151 P.3d 319 (Alaska 2006) (implying transactions regulated by Federal Medicaid laws are outside the scope of §§ 45.50.471(a), *et seq.*); Neb. Rev. Stat. Ann. § 59-1617 (stating §§ 59- 1601, *et seq.* does not apply to regulated conduct); Nev. Rev. Stat. Ann. § 41.600(4) (stating § 41.600, *et seq.* does not apply to transactions with an underlying contract).

this claim should be dismissed.[39]

### 3.    Humana's Tortious Interference Claim Should Be Dismissed.

A claim for tortious interference with contractual relations must allege: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and unjustified procurement of the contract's breach; and (4) damage to the plaintiff as a result of the breach.  *Wyndham Vacation Ownership, Inc. v. Clapp Bus. L., LLC,* 411 F. Supp. 3d 1310, 1319 (M.D. Fla. 2019).  Humana's tortious interference claim should be dismissed because Humana fails to allege: 1) that Teva had any knowledge of any of Humana's contracts with its insureds, or any facts from which the court could infer that Teva procured an insured to breach a contract with Humana; 2) how Teva's charitable donations resulted in any such breach; and 3) any contractual provision that precludes an insured from accepting monetary assistance to pay for prescription coverage.  *See* ¶ 129 (discussing waiver of copays by pharmacies or health care providers); *see also Humana v. Mallinckrodt*, 2020 WL 3041309, at *16 (C.D. Cal. March 9, 2020) (dismissing similar tortious interference claim); *Sekula v. Residential Credit Sols., Inc.*, 2016 WL 4272203, at *3 (M.D. Fla. Aug. 15, 2016) (dismissing tortious interference claim based on "conclusory allegations.").

### 4.    Humana's Claim for Unjust Enrichment Should Be Dismissed.

Florida courts require that the plaintiff directly confer a benefit to the defendant

---

[39] And, Humana's claims based on unidentified "subsequent agreements under the same or materially similar terms," (¶ 125), fail to put Teva on notice of what contracts it allegedly breached.  *See Hopkins Pontiac GMC, Inc. v. Ally Fin. Inc.*, 60 F. Supp. 3d 1252, 1257 (N.D. Fla. 2014).  Accordingly, any breach of contract claims based on these unidentified "subsequent agreements" must be dismissed.

to state a claim for unjust enrichment.  *See Vibo Corp., Inc. v. US Flue-Cured Tobacco Growers, Inc.,* 762 F. App'x 703, 705 (11th Cir. 2019) (citing *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017)).  But Humana does not allege what benefit Humana directly conferred on Teva—much less how or when Teva voluntarily accepted such benefit, and accordingly Count 9 should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, and those stated in the Motions of Defendants ACS and AssistRx, which are hereby incorporated, Humana's Complaint should be dismissed in its entirety with prejudice.

### LOCAL RULE 3.01(g) CERTIFICATION

Undersigned counsel conferred with Plaintiff's counsel via e-mail about the relief requested in the Motion, and Plaintiff's counsel opposes the relief requested.

Dated: April 2, 2021                              Respectfully submitted,

                                                  */s/Alison Tanchyk*_____

Troy Brown (*pro hac vice*)                       Alison Tanchyk (Fla. 112211)
troy.brown@morganlewis.com                        alison.tanchyk@morganlewis.com
William McEnroe (*pro hac vice*)                  Sarah Jayne Cohen (Fla. 1010683)
william.mcenroe@morganlewis.com                   sarah.cohen@morganlewis.com
Morgan, Lewis & Bockius LLP                       Morgan, Lewis & Bockius LLP
1701 Market Street                                600 Brickell Avenue, Suite 1600
Philadelphia, PA 19103-2921                       Miami, FL 33131-3075
Tel: 215.963.5000                                 Tel: 305.415.3444

                                                  *Counsel for Defendants Teva
                                                  Pharmaceuticals USA, Inc. and Teva
                                                  Neuroscience, Inc.*

<u>APPENDIX A</u>
**Relevant Federal Statute, State Statute, and State Common Law Claims & Corresponding Limitations Periods**

| Count | Law | Limitation Period | Source |
|---|---|---|---|
| 1 & 2 | Civil RICO Act, 18 U.S.C. § 1962(c) and Conspiracy to Violate RICO Act, 18 U.S.C. § 1962(d) | **4 years** from actual or inquiry notice. | *Lehman v. Lucom*, 727 F.3d 1326, 1328, 1330 (11th Cir. 2013). |
| 3 | Alaska Unfair Trade Practices and Consumer Protection Act Alaska Stat. §§ 45.50.471(a), et seq. | **2 years** from actual or inquiry notice. | Alaska Stat. § 45.50.531(f). |
| 3 & 4 | Arizona Consumer Fraud Act Ariz. Rev. Stat. §§ 44-1521, et seq. | **1 year** from accrual. | Ariz. Rev. Stat. § 12-541(5) |
| 3 & 4 | Arkansas Deceptive Trade Practices Act Ark. Code Ann. §§ 4-88-101, et seq. | **5 years** from accrual. | Ark. Code Ann. § 4-88-115 |
| 3 & 4 | California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, et seq. | **4 years** from accrual. | Cal. Bus. & Prof. Code § 17208 |
| 4 | Colorado Consumer Protection Act Colo. Rev. Stat. §§ 6-1-101, et seq. | **3 years** from accrual or actual/inquiry notice. | Colo. Rev. Stat. § 6-1-115 |
| 3 & 4 | Connecticut Unfair Trade Practices Act Conn. Gen. Stat. §§ 42-110a, et seq. | **3 years** from accrual. | Conn. Gen. Stat. § 42-110g(f) |
| 3 & 4 | Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201, et seq. | **4 years** from accrual. | Fla. Stat. § 95.11(3)(f) |
| 4 | Georgia Fair Business Practices Act Ga. Code Ann. §§ 10-1-390, et seq. | **2 years** from actual or inquiry notice. | Ga. Code Ann. § 10-1-401(a) |

| 3 | Idaho Consumer Protection Act<br>Idaho Code §§ 48-601, et seq. | **2 years** from accrual. | Idaho Code § 48-619 |
|---|---|---|---|
| 3 & 4 | Illinois Consumer Fraud and Deceptive Business Practices Act<br>815 Ill. Comp. Stat. 505/1, et seq. | **3 years** from accrual. | 815 Ill. Comp. Stat. 505/10a(e) |
| 3 & 4 | Indiana Deceptive Consumer Sales Act<br>Ind. Code §§ 24-5-0.5-1,et seq. | **2 years** from accrual. | Ind. Code § 24-5-0.5-5 |
| 3 & 4 | Louisiana Unfair Trade Practices and Consumer Protection Law<br>La. Stat. Ann. §§ 51:1401, et seq. | **1 year** from accrual. | La. Stat. Ann. § 51:1409 |
| 3 & 4 | Maryland Consumer Protection Act<br>Md. Code Ann., Com. Law §§ 13-101, et seq. | **3 years** from accrual. | Md. Code Ann., Cts. & Jud. Proc. § 5-101 |
| 3 & 4 | Massachusetts Consumer Protection Act<br>Mass. Gen. Laws Ann. ch. 93A, §§ 1, et seq. | **4 years** from accrual. | Mass. Gen. Laws Ann. ch. 260, § 5A |
| 3 & 4 | Michigan Consumer Protection Act<br>Mich. Comp. Laws §§ 445.901, et seq. | **6 years** from accrual. | Mich. Comp. Laws § 445.911(9) |
| 4 | Minnesota Consumer Fraud Act<br>Minn. Stat. §§ 325F.68, et seq. | **6 years** from actual or inquiry notice. | Minn. Stat. § 541.05(6); *Saclolo v. Shaleen*, No. A10-2165, 2011 WL 2750706, at *4 (Minn. Ct. App. July 18, 2011) |
| 3 & 4 | Nebraska Consumer Protection Act<br>Neb. Rev. Stat. §§ 59-1601, et seq. | **4 years** from accrual. | Neb. Rev. Stat. § 59-1612 |
| 4 | Nevada Deceptive Trade Practices Act<br>Nev. Rev. Stat. §§ 41.600, et seq. | **4 years** from actual or inquiry notice.[40] | Nev. Rev. Stat. Ann. § 11.190(2)(d); *Bosuwan v. First* |

---

[40] Some courts have held **3 years** under Nev. Rev. Stat. Ann. § 11.190(3)(a).  *See, e.g., Brant v. Shea Mortg., Inc.,* No. 2:10–CV–771 JCM (RJJ), 2010 WL 3154565, at *2 (D. Nev. Aug. 6, 2010).

| | | | |
|---|---|---|---|
| | | | *Option Mortg., LLC,* No. 2:09–cv–2292–LRH–LRL, 2012 WL 1330424, at *2 (D. Nev. Apr. 16, 2012) |
| 3 & 4 | New Hampshire Consumer Protection Act<br>N.H. Rev. Stat. Ann. §§ 358-A:1, et seq. | **3 years** from actual or inquiry notice. | N.H. Rev. Stat. § 358-A:3(IV-a) |
| 3 | New Jersey Consumer Fraud Act<br>N.J. Stat. Ann. §§ 56:8-1, et seq. | **6 years** from accrual. | N.J. Stat. Ann. § 2A:14-1 |
| 3 | New Mexico Unfair Practices Act<br>N.M. Stat. Ann. §§ 57-12-1, et seq. | **4 years** from accrual or actual/inquiry notice. | N.M. Stat. Ann. § 37-1-4 |
| 3 & 4 | North Carolina Unfair and Deceptive Trade Practices Act<br>N.C. Gen. Stat. §§ 75-1.1, et seq. | **4 years** from accrual. | N.C. Gen. Stat. § 75-16.2 |
| 3 | North Dakota Consumer Protection Act<br>N.D. Cent. Code §§ 51-15-01, et seq. | **6 years** from accrual. | N.D. Cent. Code, § 28-01-16 |
| 3 | Oregon Unlawful Trade Practices Act<br>Or. Rev. Stat. §§ 646.607, et seq. | **1 year** from actual or inquiry notice. | Or. Rev. Stat. § 646.638 |
| 3 & 4 | South Carolina Unfair Trade Practices Act<br>S.C. Code Ann. §§ 39-5-10, et seq. | **3 years** from actual or inquiry notice. | S.C. Code Ann. § 39-5-150 |
| 3 & 4 | Tennessee Consumer Protection Act<br>Tenn. Code Ann. §§ 47-18-101, et seq. | **1 year** from actual or inquiry notice. | Tenn. Code Ann. § 47-18-110 |
| 3 | Washington Consumer Protection Act<br>Wash. Rev. Code §§ 19.86.010, et seq. | **4 years** from accrual. | Wash. Rev. Code § 19.86.120 |
| 3&4 | Wisconsin Deceptive Trade Practices Act | **3 years** from accrual. | Wis. Stat. § 100.18 |

| | Wis. Stat. §§ 100.18, et seq. | | |
|---|---|---|---|
| 3 | Wyoming Consumer Protection Act Wyo. Stat. Ann. § 40-12-101, et seq. | **1 year** after the required written notice is furnished to the alleged violator (which must be furnished either **within 1 year** after the initial discovery of the unlawful deceptive trade practice or **within 2 years** following the consumer transaction, whichever occurs first). | Wyo. Stat. Ann. § 40-12-109 |
| 5 | Illinois Insurance Fraud Statute 720 Ill. Comp. Stat. 5/17-10.5 | **5 years** from accrual. | 735 Ill. Comp. Stat. Ann. 5/13-205; *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp. 2d 772, 793 n.7 (N.D. Ill. 2010). |
| 5 | Kentucky Insurance Fraud Statute Ky. Rev. Stat. § 304.47-010, et seq. | **5 years** from accrual. | Ky. Rev. Stat. Ann. § 413.120 |
| 5 | Pennsylvania Insurance Fraud Statute 18 Pa. cons. Stat. Ann. § 4117 | **2 years** from accrual. | 42 Pa. Stat. and Cons. Stat. Ann. § 5524; *Allstate Ins. Co. v. Am. Rehab & Physical Therapy, Inc.,* 330 F. Supp. 2d 506, 510 (E.D. Pa. 2004) |
| 5 | New Jersey Insurance Fraud Statute N.J. Stat. § 17:33A, et seq. | **6 years** from accrual. | N.J. Stat. Ann. § 17:33A-7(e) |

| 5 | Tennessee Insurance Fraud Statute Tenn. Code Ann. § 56-53-101, et seq. | **3 years** from accrual. | Tenn. Code Ann. § 28-3-105 |
|---|---|---|---|
| 6 | Breach of Contract | **3 years** from accrual. | Del. Code Ann. tit. 10, § 8106; *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013) |
| 7* | Fraud | **4 years** from actual or inquiry notice. | Fla. Stat. § 95.031(2)(a); Fla. Stat. § 95.11(3)(j); *Brexendorf v. Bank of Am., N.A.*, 319 F. Supp. 3d 1257, 1262 (M.D. Fla. 2018) |
| 8 | Conspiracy to Commit Fraud | **4 years** from accrual. | *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 784 F.3d 771, 781 (11th Cir. 2015) |
| 7 | Tortious Interference with Contractual Relations | **4 years** from accrual. | *King v. Bencie*, No. 8:17-CV-2982-T-02TGW, 2019 WL 630333, at *5 (M.D. Fla. Feb. 14, 2019), *aff'd*, 806 F. App'x 873 (11th Cir. 2020) |
| 9 | Unjust Enrichment | **4 years** from accrual. | *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234, 1237 (11th Cir. 2013) |

**Appendix B — Statutory Protection Is Limited to Patients Who Use / Take Copaxone**

| Count | State/Law | Source |
|---|---|---|
| 3 & 4 | Arizona Consumer Fraud Act Ariz. Rev. Stat. §§ 44- 1521, *et seq.* | *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (holding Ariz. Rev. Stat. §§ 44- 1521, *et seq.* did not protect the plaintiff from conduct in which defendant engaged during the course of a transaction with a third-party). |
| 3 & 4 | Arkansas Deceptive Trade Practices Act Ark. Code Ann. §§ 4-88- 101, *et seq.* | *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 2018 Ark. 149, 5, 544 S.W.3d 536, 539 (2018) (holding Ark. Code Ann. §§ 4-88- 101, *et seq.* did not protect the plaintiff because it did not use the defendant's services). |
| 4 | Georgia Fair Business Practices Act Ga. Code Ann. § 10-1-390, *et seq.* | *Williams v. Jet One Jets, Inc.*, 755 F. Supp. 2d 1281, 1289 (N.D. Ga. 2010) (holding Ga. Code Ann. § 10-1-390, *et seq.* only protects against "breach[es] of [] dut[ies] owed to the consuming public"); Ga. Code Ann. § 10-1-392(6) (stating only a "natural person" qualifies as a "[c]onsumer"). |
| 3 & 4 | Illinois Consumer Fraud and Deceptive Business Practices Act 815 Ill. Comp. Stat. 505/1, *et seq.* | *Century Universal Enterprises, Inc. v. Triana Dev. Corp.*, 158 Ill. App. 3d 182, 198, 510 N.E.2d 1260, 1270-71 (1987) (emphasizing 815 Ill. Comp. Stat. 505/1, *et seq.* is not "intended to extend to every transaction between contracting practices" and holding that it did not protect the plaintiff, who was not a user to the defendant's services). |
| 3 & 4 | Indiana Deceptive Consumer Sales Act Ind. Code §§ 24-5-0.5-1, *et seq.* | *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 807 (N.D. Ill. 1996) (holding Ind. Code §§ 24-5-0.5-1, *et seq.* did not protect the plaintiff because it "resold" rather than "used" the defendant's goods). |

| 3 & 4 | Maryland Consumer Protection Act<br>Md. Code Ann., Com. Law § 13-101, *et seq.* | *Boatel Indus., Inc. v. Hester*, 77 Md. App. 284, 302, 550 A.2d 389, 398-99 (1988) (holding plaintiff was "disqualified from recovering . . . [because] he does not qualify as a 'consumer.'"); *Morris v. Osmose Wood Preserving*, 340 Md. 519, 540–41, 667 A.2d 624, 635 (1995) ( "A sale of consumer goods under the CPA is . . . a sale in which the buyer intends to use the [purchased] goods primarily for [personal] purposes"). |
|---|---|---|
| 3 | New Jersey Consumer Fraud Act<br>N.J. Stat. Ann. § 56:8-1, *et seq.* | *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-CV-2211-BRM-LHG, 2019 WL 1418129, at *18 (D.N.J. Mar. 29, 2019) (holding third party payors are not protected by N.J. Stat. Ann. §§ 56:8-1, *et seq.*, because they "do not use . . . prescription medications themselves"). |
| 3 & 4 | Tennessee Consumer Protection Act<br>Tenn. Code Ann. §§ 47- 18-101, *et seq.* | *Operations Mgmt. Int'l, Inc. v. Tengasco, Inc.*, 35 F. Supp. 2d 1052, 1058 (E.D. Tenn. 1999) (holding Tenn. Code Ann. §§ 47-18-101, *et seq.* only applies to "consumer transactions"); Tenn. Code Ann. § 47-18-103 (stating only a "natural person" can qualify as a "consumer"). |
| 3 | Wyoming Consumer Protection Act<br>Wyo. Stat. Ann. § 45-12-101, *et seq.* | Wyo. Stat. Ann. § 45-12-105 (prohibiting parties from engaging in unfair business practices "in connection with a consumer transaction"); Wyo. Stat. Ann. § 40-12-102(ii) (defining "consumer transaction" to mean . . . [the] sale . . . of any merchandise to an individual for purposes that are primarily personal. . ."). |